## John Richards *v.* L. H. Willard, Appellant.

| 176 | 181 |
| 23 SC | 218 |
| 176 | 181 |
| 210 | 642 |
| 176 | 181 |
| 212 | ¹161 |
| 176 | 181 |
| 35 SC | 322 |
| 36 SC | ³204 |

*Practice, C. P.—Trial—Charge of court—Inadequacy.*

A charge is inadequate which fails to present to the consideration of the jury just what the issue was, by a statement of the matter of fact upon which the case turned, and a clear statement of the rules of law applicable to the questions involved.

*Practice, C. P.—Malpractice—Surgeon—Inadequate charge.*

In an action against a surgeon for alleged malpractice where the plaintiff's right of recovery depended upon the fact that there had been an actual fracture of the leg, and where the testimony on the part of the plaintiff tended to show that there was such fracture, and the testimony on the part of the defendant tended to show that there was no fracture, and the fate of the case in the hands of the jury absolutely depended upon the surgical testimony as to whether there was a fracture or merely a sprain, a charge is inadequate which contains no reference to the conflict of testimony among the medical experts, no explanation as to the expert testimony being such, nor to the effect which should be given it in determining the case, and no reference to the weight or character of the testimony on the two sides.

*Malpractice—Hospital surgeon—Negligence—Charge of court.*

On the trial of a charge of malpractice brought by a free patient against the surgeon of a hospital, where the greatly preponderating weight of the evidence disclosed the fact that the plaintiff had received proper treatment; that it was more than probable that he would have been entirely cured had he remained in the hospital, and that by his prematurely departing he brought upon himself the evils which he attempted to charge upon the defendant, it was error on the part of the court to attempt to distinguish in its charge between the injury inflicted on the plaintiff supposing he was negligently treated up to the time of his leaving the hospital and the injury which resulted from his own negligence in leaving the hospital, and dispensing with its treatment. His own voluntary act in leaving the hospital made it impossible to know whether or not he would have been cured if he had remained, and it is therefore impossible to distinguish between the consequences which resulted from his ultimate act in leaving, and those which might have resulted if he had remained. If plaintiff's negligence in leaving the hospital prevented him from recovering damages for injuries, which he afterwards sustained, he could not recover for his suffering and pain while he was at the hospital.

*Negligence—Contributory negligence—Binding instructions.*

Where the evidence introduced by defendant to establish contributory negligence on the part of the plaintiff was such as to show that all the evils alleged to have been the result of defendant's negligent malpractice might have been, and by the preponderance of evidence were, the result

of plaintiff's contributory negligence in prematurely leaving a hospital, undergoing dangerous exertion, remaining thereafter, for some time, without treatment, it was error to leave to the jury the determination of the effect of such contributory negligence, and the jury should have been instructed that under all the evidence their verdict should have been for the defendant.

Argued Nov. 5, 1895. Appeal, No. 219, Oct. T., 1895, by defendant, from judgment of C. P. No. 3, Allegheny Co., May T., 1892, No. 683, on verdict for plaintiff. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Reversed.

Trespass for malpractice as a surgeon. Before PORTER, J.

This was an action for malpractice brought by a free patient at the Homeopathic Hospital in the city of Pittsburg, against one of the surgical staff of that hospital, who happened be on duty at the time at which plaintiff was in the hospital.

Plaintiff lived at Bedford, in this state, and was a laborer, but at the time of his injury was working in the city of Pittsburg as a carpenter at wages of $2.75 per day. On the 5th of December, 1890, he fell from the platform at the top of the first story of a frame house on which he was working and was taken into an adjoining house and shortly afterwards removed to the Homeopathic Hospital where he remained until the 18th of December, when he left the hospital, going to Wilkinsburg, where he remained until the 23d, when he went to Bedford, arriving there the night of the 23d.

The next morning a physician was called, who declared that plaintiff had a complete oblique fracture of both bones of the left leg an inch or so above the ankle. The injury occurred in December, 1890, and suit was brought on the 22d of April, 1892. There was no allegation of negligence until a short time before suit was brought. The case was tried three times; the first trial resulted in a verdict for plaintiff of $5,512.50, which the court set aside; on the second trial the jury disagreed; on the third trial the verdict was for $12,000, although the plaintiff's claim in his statement was for but $10,000. The court refused to order a new trial but required the plaintiff to abate all in excess of $4,000 which he did, and this appeal was then taken.

The facts and a synopsis of the material portions of the testimony will appear in the opinion of the Supreme Court.

The court charged the jury in part as follows :

There are certain facts in this case that are not in dispute, and it possibly would be well to review them briefly in order that you may understand the questions upon which you will have to pass under the evidence in the case. It may be taken as agreed upon all around that on the 5th day of December, 1890, this plaintiff, Richards, fell or was thrown by the falling of a scaffold a distance of some eight or ten feet to the ground and was picked up injured and carried into a house in the neighborhood; that there Dr. McClelland examined him, passed an opinion upon his injuries and sent him to the Homeopathic Hospital; that that hospital is an institution maintained partly by state appropriations and partly by voluntary contributions; that there is connected with that hospital a resident surgeon who devotes his entire time to the hospital, and that under the system of management there adopted, a surgeon in chief, or physician having charge, controls or directs the medical department of the hospital during the time for which he, under the arrangement effected by the physicians who have agreed to contribute their time there, is to so have charge. These surgeons in chief give their time and skill without compensation, and they rotate in the discharge of the duties of physician in chief, or surgeon in chief. The plaintiff was taken to this hospital at a time when the defendant was discharging the duties of surgeon in charge, or in chief, was received in the hospital, and the defendant examined him the same afternoon, the 5th of December, and continued to examine him and visit him from time to time, assuming the general direction and examination of his case. The plaintiff remained there until the 18th of December, 1890. The defendant last saw him and prescribed for him, or examined him with a view to his condition, on the 17th of December. On the 18th of December the plaintiff left the hospital, went to Wilkinsburg and there remained until the 23d of December, when he took a train, went to Huntingdon, from Huntingdon to Bedford, and on the 24th of December called in a physician. During the time intervening from the leaving of the hospital until his arrival in Bedford he was with-

out medical attendance.    These are the facts concerning which there is no dispute.

It is alleged on the part of the plaintiff that his leg was fractured through both bones, the lower section of the leg; that he was not treated by this defendant with that ordinary skill of the profession prevailing in this community, and that the defendant did not give to the treatment of his case that reasonable care under the circumstances which it required; that as a consequence of this negligence he suffered unnecessary and unusual pain, incurred expense, was for a long time ill, and that as the consequence of the negligence of the defendant the leg which was injured has been permanently disabled, that the ankle joint is stiff and that his earning power is thereby impaired.

On the part of the defendant it is contended that there was no fracture of the bones of the leg, that it was a sprain ; that he gave to him all the care which the injury required, and that he brought to the treatment of this case the ordinary skill of the profession, and gave to it that reasonable care which the circumstances required ; that further, even if there had been a fracture, the negligence of the plaintiff in leaving the hospital against the advice of the physician, and when a man of reasonable prudence ought to have known that it would be injurious, contributed to produce this injury, if injury there was, and that so he is estopped from asserting that the injuries from which he now suffers, the disability which is now alleged to have resulted from this wound, was occasioned, even if contributed to by the negligence of the defendant,—was occasioned at least in part by the negligence and misconduct of the plaintiff himself. . . .

Gentlemen, when the defendant undertook the treatment of this injury he did not become an insurer and guarantee a recovery or a cure.    The obligation which this state of affairs put upon him was that he should exercise the ordinary skill of the profession in treating the injury, not the highest skill of which men of genius in the profession are capable, but simply the ordinary skill of the community, the ordinary skill of physicians at the time and place, and that he would give to the treatment of this injury reasonable care and attention ; and this being the duty that was put upon him, the exercise of ordinary skill and

care under the circumstances, he would only be liable in case he failed in the discharge of that duty, and such a failure would be what in law is called negligence. The burden is upon the plaintiff to satisfy you of the existence of such negligence, that is, in this case, the burden is upon him to show you by the evidence that the defendant did not in the treatment of this injury give him the benefit of ordinary skill and care, and that as a consequence he was injured. And in presenting this to you, he must be able to present a case free from contributory negligence upon his own part. Such a case being presented to you, then the defendant may answer it by denial of the facts alleged by the plaintiff, by showing that such an injury did not exist or that he gave it the reasonable and ordinary care of the profession under the circumstances, or he may defeat a recovery by showing, if it has not already appeared in evidence, that the negligence of the plaintiff has contributed to the injury. He may by affirmative evidence satisfy you of the existence of that contributory negligence upon the part of the plaintiff, which, when it does contribute to produce injuries, defeats a recovery, because in such cases you cannot discriminate,—if the negligence of both parties has contributed, you cannot discriminate and say how much was the result of negligence upon the part of one, and how much was the result of the negligence upon the part of the other. Now, in this case you had, when this man came to the hospital, an injured man coming under the care of a physician. Upon one hand, then, the duty was the exercise of ordinary skill and care. The duty upon the other hand was obedience of all reasonable instructions of the physician. While it is the duty of the physician under such circumstances to exercise skill and care, it is the duty of the patient to obey.

The first point, gentlemen, upon which you will have to scan this evidence is as to the nature and extent of the injury that existed. You must, in passing upon that question, consider all the evidence in the case, beginning with the evidence of the man who saw him when he fell upon the ground, Mr. Williams, I think; the evidence of Dr. McClelland, who saw him at the time, made an examination of him and gave an opinion then and there of the nature and extent of the injuries, and including the testimony of those at the hospital and of all who saw him afterwards, and the testimony of the physicians who have

been called upon the respective sides as to what is their professional opinion touching the nature of the injury to that limb at the time. The burden is upon the plaintiff to satisfy you that the bones were fractured. It is upon that theory that he seeks to recover. No evidence has been offered, I believe, with a view to charging this defendant with negligence in the treatment of the limb if it was only a sprain. All the evidence offered is upon the assertion and in the support of it, that the limb was fractured. If, therefore, it was not fractured, that is an end of the case, and your verdict must be for the defendant.

You will, then, consider all the evidence bearing upon the point, the evidence of those who saw the limb and the evidence of these expert witnesses called by the plaintiff and by the defendant, and who, because of their special study of such matters, their long active participation in their calling, which familiarizes them with the appearances produced by certain injuries, and their special fitness, are permitted to testify as experts in such cases. Considering all this evidence, you must determine the question upon the weight of the evidence, the burden being upon the plaintiff to satisfy you that the bones of the leg were fractured. If he has so satisfied you, you proceed to inquire further. If he has not so satisfied you, you stop there and render a verdict in favor of the defendant. If the bones of the leg were fractured, then, while this man, the plaintiff, was in the hospital, did this defendant exercise the ordinary skill of his profession and give to the treatment of this injury reasonable and ordinary care? The burden is upon the plaintiff to satisfy you of the absence of that. In other words, he must establish negligence affirmatively. You consider all the evidence and make up your minds upon that point. [If he has satisfied you by the weight of the evidence that this defendant was guilty of negligence in the treatment of the injury while he was in the hospital, then for the results following such negligence or for the results caused by such negligence, the defendant would be answerable in damages, unless from all the evidence in the case you are satisfied by the weight of the evidence that this plaintiff was guilty of negligence which contributed to produce the injury.] [9] You will, therefore, consider all the evidence in determining whether or not in the first place this physician, the defendant, was negligent in the treatment of this man during

his stay in the hospital.  If he was, then did this man while in the hospital suffer unusual pain, suffer pain that he would not have suffered if the wound had been properly treated, suffer pain or injury as the result of this negligence?  If he did, then for such pain and suffering he would be entitled to recover, and for such injury as was caused by that negligence alone he would be entitled to recover.  If you find, upon consideration of all the evidence, that the weight of this evidence is not with the plaintiff upon this matter, if he has not satisfied you by the weight of the evidence that the defendant was negligent in the treatment of the case, then that is the end of the case, and your verdict must be in favor of the defendant.  [But, if he has satisfied you, then, unless upon all the evidence it appears that the negligence of the plaintiff contributed to produce the injury, the plaintiff is entitled to recover damages for the pain and suffering and for any other injury resulting from the negligence of the defendant, and for no other cause.] [10]  This brings you, then, to the time when this plaintiff left the hospital.  The last interview with the defendant was upon the 17th of December; and, gentlemen, you have to determine upon all the evidence in the case the circumstances surrounding that leaving and what led up to it, bearing in mind in this, as in other things affirmatively necessary to this case, that the burden is upon the plaintiff to satisfy you that the doctor was negligent in discharging him from the hospital.  [The plaintiff says that upon the 17th of December the doctor told him that he was cured, that he could go home, and that as a consequence he went home.] [11]  That at that time the doctor signed what he calls a card, signing it there in his presence, and the card has been produced.  This card you have examined.  It is rather a history of the case, seemingly, and of the man's past life, than a record of prescription given him at the time, or orders made for his treatment.  Upon the face of this card it seems the date of discharge, as indicated by the figures, was written by Dr. Marshall, and is fixed as the 18th day of December, 1890.  If Dr. Willard signed the card at that time, on the 17th of December, it could only be evidence for what was upon it at the time he signed it, and anything that any person else wrote upon it afterwards without his direction and concurrence would be no evidence against him.  [If, then, he did sign this card on the 17th of

December, and the words or figures indicating that the man was discharged on the 18th of December, 1890, were not there at that time, then those figures afterwards added without his knowledge, unless you find that they were added with his knowledge, could have no bearing upon this case.] [12]   The card may possibly have been a mere history of the case, intended for statistical information connected with the hospital, rather than a place for the entry of orders for the guidance of subordinates in the hospital.   The plaintiff says that after this conversation on the 18th he left the hospital.   Now, there is no doubt that upon this 18th of December he went to Wilkinsburg and remained there for several days without medical attendance.   You will bear in mind, gentlemen, this fact, because such action might or might not be negligent in the plaintiff, in one light of the evidence, and the reverse in the other, as to what occurred at the time this defendant left the hospital.   [If the doctor told him that he was cured and he could go home and he was misled by that and thought he was cured and went home and suffered an injury as a consequence, then, if you find that the doctor was not exercising ordinary skill and care in thus sending the man home and so was guilty of negligence, he would be answerable in damages for the consequences.] [13]   If the plaintiff was misled by that direction of the doctor and went home, his mere going would not be contributory negligence unless he went under circumstances such as would visit upon him knowledge of the fact that it was not safe for him to go.   If, under such circumstances, even, the doctor told him he could go, when he knew that it was not safe for him to go, but concluded he would take the chances, or if he went under such circumstances as ought to have indicated to a man of reasonable prudence that it was unsafe for him to go and that he would endanger his condition if he went, then the plaintiff would be guilty of contributory negligence.   If he, knowing that, or under circumstances such as ought to have caused him to know that it was dangerous for him to go, took the chances, then the chances were his own.   But, if relying upon the advice of his physician, he went under such circumstances, believing that, as he had the advice of his physician, it was not an improper thing for him to do, went to Wilkinsburg and remained there, not knowing that his leg was fractured, not believing that it required attention, and

continuing in that condition down until the time he went to Bedford, nothing having occurred and nothing existing which ought to have indicated to a reasonable man that his leg required attention and that he was endangering it by traveling in that way, then he would not be guilty of contributory negligence simply in going out and going upon his journey.

The defendant says that he did not tell him he was cured, that he signed this card sometime afterwards, that he did not consent to his going out. Dr. Marshall has testified as to his recollection of what occurred at the time of this last interview and denies having heard some of the expressions that this plaintiff has attributed to the defendant as to his condition. But, gentlemen, you must pass upon those questions under all the evidence. [The nurse has testified as to what the doctor said, and it is for you to say whether or not—that is, you are to judge of the meaning of the words which she used in testifying, and you are to take your recollection of what she said with regard to whether or not she communicated this statement of the doctor to the plaintiff. If she did communicate it to the plaintiff, and he went out afterwards, that would be an end to all claim for damages resulting from his going out and from his subsequent improper treatment. If you find that the nurse went to the doctor and he told her to tell the plaintiff that if he went out he went at his own risk, and she did tell him so and he went out, then he went at his own risk,] [14] because he was disobeying in such a case the instructions of his doctor; and if, after that, he suffered unnecessary pain because of his lack of treatment, if after that time from traveling, it had resulted in permanent injury to his limb, that was one of the risks that he took and he could not recover from this defendant for it. You will observe, then, gentlemen, that after the primary question which you have to determine, whether or not the leg was broken, and the question whether or not, if it was broken, this defendant treated it with ordinary skill and care, the next important question you come to is what occurred at the time this man left the hospital and immediately leading up to his leaving the hospital. If the man left the hospital upon the directions of his doctor, being told that he was cured, or practically so, and that he could go home, and suffered an injury in consequence of so leaving, suffered an injury due to the negligence

of the doctor in not exercising ordinary skill and care, then he could recover for that injury, unless you find that the circumstances were such that as a reasonable person he knew or ought to have known that he was endangering his condition; and then his right to recover would be defeated upon the ground of contributory negligence. In the absence of contributory negligence, he would be entitled to recover damages for the injury he suffered. If, on the other hand, the man left the hospital in the teeth of the advice of his physician, and because he did so, suffered an injury, it would be simply a gross injustice and hardship to hold a physician connected with an institution charitable in its nature in this way for the consequences of the misconduct of the patient; and the plaintiff if he did go out under such circumstances could not recover for what resulted from his going out and from the subsequent travel and neglect. If the plaintiff was neither told by the doctor to go or stay, but left of his own accord, is another view; because you must find under all the evidence in the case what did happen. If without asking the doctor, without his consent, he left, then the doctor would not be responsible for the consequences of his leaving, and if his present condition is owing to taking the journey unauthorized by his physician, he could not recover damages for anything that resulted from his leaving the hospital. [And in either of these cases—in the case he went out in the teeth of the advice of his physician, or if he went out without the consent of his physician, without saying anything to his physician about it, if he simply left without the knowledge of the doctor, his right to recover would be limited, in case you find that the limb was fractured and that the doctor was guilty of negligence—his right to recover damages would be limited to such damages as he suffered before leaving the hospital, if you find that what he did in leaving the hospital contributed to produce the injury.] [15] Now, you have three views of the case upon the question of the manner of his leaving the hospital, and you have to make up your minds, from all the evidence in the case what that manner was—whether he left by the direction of his physician, or against the advice of his physician, or without his physician knowing anything about it. [There is another view, possibly, under the evidence, which it might be well to consider. In case this man told his doctor

that he was going to leave and the doctor neither consented nor objected; in such a case, if the man said to the doctor that he intended to leave the hospital the next day, then the doctor would have upon him the duty of giving him such advice and directions and care in view of that fact as a man of ordinary skill in the profession exercising reasonable care ought to give under the circumstances; and if such a physician would have advised him of the danger of going out, then it was the duty of this defendant to advise him of that danger.] [16] If such care and skill required that this limb should have a splint upon it when the man went out, then if the doctor failed to take that precaution, or to give directions to have it taken, he would be guilty of negligence and would be answerable for the consequences, unless the evidence in the case, from its weight, satisfied you that the plaintiff in that matter was guilty of contributory negligence. In such a case, if the doctor neither consented nor refused to permit him to go, but simply received notice from him that he was going, and then, without objecting or consenting, permitted him to go under such circumstances as would amount to negligence in the treatment of it, yet if at that time the plaintiff knew that his going was a dangerous thing, that it would be likely to result in injury to him, or if a man of reasonable prudence ought to have known that it would result in injury to him, and notwithstanding that knowledge, or knowledge of the facts which ought to have indicated to him that this state of affairs existed, he went, he would be guilty of contributory negligence and could not recover. If the plaintiff was simply dissatisfied with his treatment and thought he was getting worse, and believed that his leg was in a bad condition, and determined that he would go out whether the doctor said so or not, and told the doctor that he was going, then primarily if the doctor knew that he was going, he could have objected, told him he mustn't go; and if he went he would be liable for the consequences of his own going, that is, he could not recover from the doctor. If the doctor neither consented nor refused, but let the man go, if he knew he was going, it was his duty either to warn him not to go or to take the usual and ordinary precautions preparatory to his going, and a failure upon that would be negligence on his part; but if the man knew that he was getting worse all the time, that his leg

was in bad condition, that he wasn't cured; then, if that state of facts indicated to him that the going out was a dangerous or unsafe thing to do, then that would be negligence on his part and he could not recover. [The connection of the physician with this case ended on the 17th of December. His liability is fixed against him, or in his favor, by what occurred down to that time.] [17] He gave no advice afterwards. Subsequent events simply become evidence because they may throw some light upon what had occurred before, and indicate the real nature and extent of the injury. If you find all these questions in favor of the plaintiff upon the weight of the evidence, find that he was treated negligently, discharged negligently, and do not find that his own negligence contributed to produce these subsequent injuries, then for the consequences of such negligence which a man of reasonable foresight under the circumstances ought to have anticipated, the defendant would be liable in damages. In other words, if you find that the leg was fractured, that the defendant treated it negligently, that he discharged the man from the hospital, or permitted him to go out under circumstances which would render him liable for negligence, and the man went out and suffered injury, then the defendant would be liable for all such consequences of his negligence as a reasonable man under the circumstances would have been expected to foresee and guard against. If some unusual circumstances intervened, if the man was badly treated afterwards, or if because of some latent quality in his system which reasonable care in the physician could not have foreseen and guarded against, an injury which to the ordinary man would have been slight, proved more serious to him, then for such unusual and extraordinary consequences, a physician would not be liable, even although he had been negligent in the treatment of the case. A man is not expected to foresee results that are out of the ordinary and are unusual, and, therefore, is not to be charged with such results.

If you find for the plaintiff upon all of these questions of fact, then for such unnecessary pain and suffering, for loss of time and for such consequences to the general condition of the man as reasonable skill ought to have foreseen was likely to result from this course of treatment, and for the diminished earning power resulting from such consequences, this plaintiff would be entitled to recover damages.

You will give the case, gentlemen, your careful consideration, starting out with the determination to do what is right and just, and not be swayed by prejudice or sympathy. On the one hand you have a man who has been unfortunate. On the other hand you have a physician occupying a position of responsibility in an institution which is one among a class essential to the prevention of great suffering among those who are most likely to suffer, in the administration of which men of skill voluntarily contribute their time and their talent. It is important to this plaintiff who has suffered, if he has cause to legally recover, that your verdict should be just to him; and it is important on the other hand that the defendant should not because of his mere connection with a work of charity be mulcted in damages, unless you are satisfied by the weight of the evidence that he failed to bring to the treatment of this case the ordinary skill of his profession in examining the man and determining the character of the injury and subsequently treating him, or that he failed in giving him reasonable care under the circumstances.

You must, therefore, be satisfied by the weight of the evidence that the bones of the man's leg were fractured, that the defendant failed to exercise reasonable skill and care in discovering the nature of and treating the injury, that the plaintiff suffered damage as a consequence which is reasonably attributable to this negligence. [And in case you find all of those things, if under the evidence you find that this plaintiff was himself guilty of negligence which contributed to produce his suffering and his present condition, then from the moment that that negligence of the plaintiff contributed to his pain and contributed to the production of the injuries which have incapacitated him in a measure, from the moment that these two chains of causation become mixed and mingled, for such pain as his negligence contributed to, for such incapacity as his negligence in any way contributed to, there can be no recovery against this defendant.] [18] For such elements of damage as you hold this defendant, if you hold him for any, you must find them to be the result of his negligence; and for any incapacity that under the evidence you find has been contributed to by the negligence of the plaintiff, there can be no recovery in this action.

Plaintiff's points and answers were as follows:

3. That the Homeopathic Hospital is not answerable in dam-

ages for the negligent act of defendant, it being an institution supported by funds donated by the state and individuals, which funds are not to be used for the purpose of paying damages for the torts of its officers. *Answer :* This point is affirmed. [7]

5. That if the jury believe the plaintiff was deceived, misinformed or wrongfully advised by the defendant as to the nature and extent of the injury from which the plaintiff was suffering, and that the plaintiff did not know the nature and extent of such injury, then plaintiff is not to be held guilty of contributory negligence unless he knew or had reason to know that travel and absence of medical treatment would endanger his condition, and the burden of proof of contributory negligence rests upon the defendant. *Answer :* This point is affirmed. [8]

Defendant's points and answers were as follows :

1. Under the pleadings and evidence the verdict should be for the defendant. *Answer :* This is refused. There are certain questions of fact upon which the jury must pass. [1]

2. If the jury find that the negligence of the plaintiff contributed in any degree to produce the injuries of which he complains, then the verdict should be for defendant. *Answer :* This point is affirmed as to all injuries and suffering to the production of which the negligence of the plaintiff contributed in any degree. [2]

3. Under the evidence, the plaintiff in remaining at Wilkinsburg for five or six days without medical treatment and in making his subsequent journey to Bedford was guilty of contributory negligence. *Answer :* This point is. refused. It involves a question of fact which is for the jury. [3]

4. The mere fact that the defendant did not discover the fracture, if one existed, and therefore failed to treat the plaintiff in the manner in which Dr. Enfield says should have been done is no evidence of negligence. *Answer :* This mere fact as stated is not sufficient evidence of negligence. But any evidence going to establish said fact is to be considered by the jury in connection with all the evidence in the case in determining whether or not the defendant used ordinary skill and care to ascertain the character of the injury. [4]

5. Under the statement and evidence the plaintiff is not entitled to recover for any injuries caused by putting on the tight bandage at the time he left the hospital. *Answer :* This

point is refused. If the defendant ordered the bandage to be put on in the manner in which it was and the plaintiff was injured thereby, then it is for the jury to determine under the evidence whether the defendant failed to exercise ordinary skill and care in so ordering the bandage. [5]

6. The evidence of Miss Blosser, not denied, is that in answer to an inquiry from the plaintiff as to his leaving, Dr. Willard said when leaving the ward that if plaintiff left the hospital he did so on his own responsibility, which message was communicated by her to plaintiff at that time, and the plaintiff having left after receiving this notice, and further, the testimony showing that his condition on arriving at Bedford and subsequent thereto was attributable to his journey and the want of medical attendance, the plaintiff cannot recover in this action. *Answer :* This point is refused. The facts and circumstances connected with the plaintiff's leaving the hospital are to be found by the jury under all the evidence in the case. [6]

*Errors assigned* were, (1–18) above instructions; (19) the entire charge as an inadequate presentation of the case to the jury; (20–23) rulings on testimony,—see opinion of the Supreme Court.

*W. B. Rodgers*, with him *J. R. McCreery* and *J. H. Beal*, for appellant.

*Wm. M. Hall, Jr.*, for appellee.—The burden of the argument of the counsel for appellant is that the court should have given binding instructions to find a verdict for the defendant on the ground that the plaintiff was guilty of contributory negligence. We deny that there was the slightest evidence of contributory negligence in this case ; but if there was any such evidence, the rule of law is so plain that it is unnecessary to cite authorities to show that this case must have gone to the jury. Four precedents will suffice in any event: Railroad Co. v. Jones, 128 Pa. 308 ; Neslie v. Rwy. Co., 113 Pa. 300 ; Baker v. Gas Co., 157 Pa. 593 ; Fisher v. Ry. Co., 131 Pa. 292.

OPINION BY MR. JUSTICE GREEN, July 15, 1896 :

This is a case of extraordinary and unusual character. The plaintiff claims damages against the defendant for negligent sur-

gical treatment for an injury to his leg. He alleges that he had sustained a fracture of both bones of his leg at a short distance above the ankle joint, and was treated not for a fracture but for a sprain, and was thereby greatly injured. It is not claimed that the treatment he received was improper treatment for a sprain, but that it was entirely incorrect and inadequate treatment for a fracture. The defendant denies most positively that there was a fracture and his testimony is supported by that of two other surgeons who saw and examined the plaintiff's leg on the day, and immediately after the injury was sustained, and also a number of surgeons who examined it at subsequent times and testified that in their opinion there never was a fracture. If there was no fracture the plaintiff has no case. If the subsequent condition of suffering and illness of the plaintiff was produced in whole or in part by acts of contributory negligence on his part, he could not recover, and on both these points the court so instructed the jury.

The great controversy in the cause turned upon these two points, and especially upon the question whether or not there ever was a fracture. The singularity of the case arises upon the character of the testimony and the conflict developed as to the great leading fact. The alleged fracture was declared by the plaintiff's surgical witnesses to be a compound fracture of both bones of the leg, the tibia and fibula, at a point about one and a half to two inches above the ankle joint. The fracture of the tibia, or shin bone, was by far the most important. One surgical witness for the plaintiff, Dr. Enfield, testified that he saw the plaintiff for the first time on December 23, 1890, at his office in Bedford, the accident having occurred on December 5, at Allegheny City, and that he readily and in a very few minutes found a complete fracture of both bones. In the fracture of the tibia the lower portion of the bone projected up over the upper portion about half an inch, and made a distinct ridge easily perceived by the eye and of course by the touch. This was eighteen days after the accident. One other surgical witness, Dr. Calhoun, was called in and saw the leg on January 23, 1891. He also testifies that he inserted his finger in a hole in the leg which had been produced by suppuration and found the ends of broken bones overriding each other, and testified that there was a fracture of the tibia. He knew nothing about the fibula.

The foregoing was the whole of the original surgical testimony given by the plaintiff to establish the fact of fracture.   Two other surgeons were examined by the plaintiff, but neither of them saw the leg until long after the accident, and they only testified as to general matters connected with, or relating to fractures and treatment.   Their testimony and that of Drs. Enfield and Calhoun constituted the whole of the plaintiff's surgical testimony.

All of them, and all of the other surgical testimony in the case establish that fractures of the tibia are most easily discovered, generally they are directly visible to the eye without the help of manipulation.   But by means of slight manipulation such fractures are detected without the slightest difficulty.   The reason is that the tibia has very slight covering over it in the way of muscles, tissue or flesh.   The bone can be readily felt by the fingers over its whole length and especially near the ankle.

One of the surgeons, Dr. Hartmyer, testifying upon this subject, and explaining to the jury why it would be easy to detect such a fracture, said, " Why simply because the deformity in a fracture of that kind would be so great that to the naked eye of an experienced man the fact would reveal itself at once that the fracture existed and by manipulating that leg I dare say that it would be impossible for any man under the sun that knows anything about anatomy in the first place and surgery in the second place to make that mistake; it would be an utter impossibility."

Dr. Enfield, the plaintiff's principal witness, was asked: " Q. Now will you state what in your experience and from your knowledge of medical science is true as to this point of the anatomy, the leg, in reference to the discovery of a fracture at this point?   A. They can be discovered more readily than perhaps any other portion of the body.   Q. Why is that? A. That is owing to the thin covering of the muscles over the parts and owing to the fact that there is little swelling takes place in a fracture at this point.   The tissues are compact and not so full of cells, and you can usually by the guide of the bone, especially the sharp spine that is along the tibia, as a guide, you can usually discover the fracture in that bone, and there is almost always deformity at this point."   There was abundant other testimony to the same effect.

Now bearing in mind that the establishment of a fracture was an essential and fundamental condition of the plaintiff's right of recovery, it becomes necessary to recur somewhat to the testimony of the defendant.   The accident happened at about noon on the 5th of December, 1890.   The first surgeon who was called to see the plaintiff after the injury was Dr. McClelland.   He said he made a careful examination of the leg in the usual manner " by manipulation and the ordinary means employed to make an examination by inspection and manipulation," and found that the patient was badly bruised but there were no bones broken.   Being asked, " Q. Was there any fracture, Doctor," he replied, " There was no fracture."   He advised that the plaintiff be sent to the hospital, which was accordingly done. Dr. McClelland was recalled later, and said he had examined the plaintiff at the time of the second trial which was in June, 1893, and had not seen him from the time of his first examination until then.   He repeated that there was no fracture at the first examination, and he was then asked a long question which described the fracture as testified to by Drs. Enfield and Calhoun, and was asked: " Q. Was there ever such a fracture as that on this man's leg?   A. I would say not.   Q. Will you tell the jury why you say that?   A. I say that because there was no evidence of fracture when I saw him first and I found no evidence of fracture when I examined him last."

The next surgeon who saw the plaintiff after the accident was Dr. Marshall, the resident surgeon at the hospital.   He went with the ambulance and assisted to remove the patient to the hospital, first making an examination at the place where he found him.   After he reached the hospital the patient was undressed and put to bed, and he then proceeded to make a full and thorough examination of the leg, by all the usual and well known methods practiced by all surgeons in such cases.   He compared the two legs for shortness, manipulated the limb with his hands, following the bones as far as he could.   He then examined for crepitus and then tried it for mobility, by taking hold of it by the heel and twisting it, holding the leg fixed.   He was unable to find any evidence of fracture and diagnosed the case as one of sprain and concussion and treated it accordingly with hot compresses and hamamelis extract, to allay pain and reduce swelling and inflammation.   About 4 o'clock the same

afternoon Dr. Willard came in, and he also examined the patient, going over all the methods usual in such cases. No evidence of fracture was discovered and the treatment for subduing inflammation was continued. The next day Dr. Willard called again and made another and fuller examination, trying the leg in every way by comparison for shortness, for crepitus and mobility, and by tracing the spine of the tibia with his fingers to see if any evidence of fracture could be discovered. No fracture was discovered or any evidence of any and the treatment was continued for sprain and concussion.

Dr. Willard himself describes the method of his examination. He says, "The next examination was made I think a day or so afterwards, and then the examination was more thorough. I would take the leg in both hands, one hand at the heel and the other at the ankle joint and made the ordinary manipulations. Q. Now what were those? A. Well it was from one side to the other, up and down; those were the ordinary manipulations, in the first place to find out if there was any crepitation and in the second place by putting it side by side we would see if there was a fracture; the portion of the bone perhaps could be felt by the finger. These are the manipulations; taking this portion of the heel in my hand and working it backwards and forwards in that manner and then working it up and down so" (explaining to the jury). He had previously stated in the other part of his examination, thus: "I then examined him by running my hands over the spine of the tibia, down the course of the fibula, didn't make much motion, compared one leg with the other to see if there was any shortening; there was no apparent shortening at all." He made several of these examinations while the patient was at the hospital, four or five in all. He was asked, "Q. Well, doctor, what conclusion did you arrive at as regards this case? A. That there was no fracture."

Now there was not a particle of testimony in the case that this was not the usual, correct, proper and sufficient method of examination in ordinary use by all surgeons, and so far as this subject is concerned there was no testimony to the effect that this was incorrect practice in any degree. Three skilled, competent and careful surgeons, in full practice, testified, after having seen and carefully examined the plaintiff immediately after the accident and on succeeding days, that there was no

fracture of the leg.    The treatment given to him was the proper and usual treatment if there was no fracture, and there was nothing in the testimony upon which a right of recovery could be based, except that there was a fracture in fact, which was not discovered by any one of these three surgeons, but was discovered by two other surgeons, the first of whom saw the patient for the first time eighteen days after the accident, and the other of whom first saw him forty-eight days after that event.

On behalf of the defendant six other surgeons were examined, several of them of the largest and most extensive experience, thoroughly competent in every way, all of whom examined the plaintiff's leg at different times, and every one of whom testified that in his opinion the leg never was fractured, giving his reasons with much detail.    Dr. Hartmeyer, one of these witnesses, was asked whether judging from his examination of the leg, there had ever been a fracture, and he answered as follows: " A. From the evidence I find after careful examination during the last trial, I would say it never existed.    Q. And, doctor, to what do you attribute the present condition of Mr. Richards' limb ?    A. The present condition as I find the evidence there now, I would attribute to a high degree of inflammation, to caries, and a part of it due to the surgical interference subsequent to that; operative procedure in other words.    Q. Doctor, referring to the spine of the tibia on Mr. Richard's limb, I wish you would state whether you examined that closely ?    A. I did. Q. If there was a fracture of the tibia you might state whether it would be shown upon that bone ?    A. If there was a fracture as described it most undoubtedly would be shown ; it couldn't fail to be shown.    Q. And did you make a special examination of the spine of the tibia with reference to that ?    A. I did. Q. Is there any evidence, Doctor, that the spine of that tibia or any portion of it at a point about an inch and a half above the ankle joint was ever cut off ?    A. No, sir, I found it intact."

Dr. Hamilton, a surgeon of forty years or more, and in the service of the Pennsylvania Railroad Company for over thirty years and who had seen six or seven thousand cases of accidents to their men, testified that he had examined the plaintiff's leg three times, and being asked whether there had been a fracture, said, " There is no evidence to me that he had a fracture at the time stated, nor of the kind referred to.    I don't think

he could have had such a fracture and have his limb present the appearance that it does at the present time." He then explained to the jury fully the reasons for his opinion, among others, that he had followed the spine of the tibia down to the ankle bone and it was perfect without any line of deformity, and that there was no evidence that the bone of the tibia had ever been thrown forward a quarter or a half of an inch. He also measured the legs and found them absolutely of the same length. Dr. Buchanan, a surgeon of large experience, testified that he had examined the plaintiff's leg carefully and found no evidence that there had ever been a fracture. He was asked, " Q. In your judgment was there ever such a fracture as detailed by his surgeons in his case? A. No, sir." Dr. Murdock, a surgeon of more than forty years with an enormous experience in the hospitals, in the army all through the war, and in his private practice, testified that he had examined the plaintiff's leg very carefully by feeling it, measuring it and comparing it with the other leg, and the fracture as described by the plaintiff's surgeons having been explained to him, said, " There is no evidence of there ever having been such a fracture." He said he measured the leg and found no shortening in it, that he had run his finger down along the spine of the tibia and found no prominence or depression at the place of the alleged fracture. Dr. King, a surgeon of thirty years experience in the army and the hospitals, and in his private practice, testified and gave the results of his examination of the plaintiff's leg. He was asked, " Q. Well, doctor, from your examination of that wound, what is your opinion as to whether it ever was fractured or not, as described? A. I don't believe it was ever fractured." He explained the reasons for his opinion very fully to the jury. Dr. Dickson, a surgeon of twenty-five years practice, very largely in the hospitals and on railroads, said he had examined the plaintiff's leg, and was asked, " Q. And I wish you would state whether there was any fracture of the tibia and fibula as stated? A. I can see no evidence of that limb having been fractured at any time."

In addition to all this Dr. La Place, who had treated the patient's leg after Drs. Enfield and Calhoun were unable to help him, said the plaintiff had tuberculosis of the tibia, and that he treated him successfully for that disease. He also said he had

found no evidence that there had been a fracture of the limb. This witness had been examined for the plaintiff but as his testimony was unfavorable he was examined by the defendant on the second trial. He was asked, " Q. Did I understand that there was no evidence of a fracture ? A. None. If there had been I would have seen it if it could be seen. Q. You don't know whether there was a fracture there or not ? A. I can't say with absolute certainty but I say this, that if there had been a fracture, it surely would have shown." A vast amount of confirmatory evidence was given in the course of the very long examination of the surgical witnesses but it is too cumbersome to repeat in detail.

It is sufficient to say the great preponderance of the testimony, and that which was best informed and most reliable, tended to show that there never was a fracture of the limb such as was testified to by Drs. Enfield and Calhoun. The most experienced of the surgeons easily accounted for the conditions to which those witnesses testified. Dr. Hamilton said, " I think the action of the patient in leaving the hospital was very injurious to his limb and was the cause of his condition at present." He was asked, " Q. Doctor, where there has been an injury to a leg in the region of the ankle, followed in a few days by severe inflammation extending in and around the joint, which leg is examined by a surgeon at the end of three weeks from the accident, at which time the periostium is carried away or roughened, and the bone roughened, and small pieces of bone have come away, would a physician be liable to be mistaken as to his diagnosis as to that being a case of fracture ? A. He might be. He would be much more likely to be mistaken in his diagnosis than for the man to have gone home in that condition."

Dr. Murdock being asked whether he would not expect Drs. Enfield and Calhoun to be correct in their diagnosis because they had examined the leg recently after the accident, replied, " I would expect them to be correct, and I would say that Dr. Enfield was correct if I hadn't examined this limb since and found that he was mistaken." He was asked, " Q. Well, suppose he got his finger into the wound, would the disease, tuberculosis, be likely to develop such a state of affairs as to lead him to suppose that there was a fracture when no fracture ex-

isted? A. Yes. Q. How would that be? A. Well, if he got his finger into a bone that was denuded of its periostium and in which caries was going on, it would convey to his finger the same sensation, or very nearly the same sensation, that the ends of the bone would after having been rounded off by some little period of time; the same sensation would be conveyed to his finger, and also if a probe was put in, the same sensation would be conveyed to the end of the probe as in the case of fracture, and in the case of disease he wouldn't be able to tell the difference."

It must be remembered that Dr. Enfield never effected any cure of the plaintiff's limb, although he treated him for fracture. He continued to treat him for about a year. He said, "Well, he failed to improve after Dr. Calhoun and I had operated on him several times. I sent him to Philadelphia to the hospital, and gave him a letter to Dr. Pancoast, describing his case." It was at this time that he came under the treatment of Dr. La Place, who said that he discovered no evidence of fracture and treated him successfully for tuberculosis of the bone, which was the disease which he said the plaintiff really had.

It must also be remembered that nobody has ever actually seen this alleged fracture. Neither Dr. Enfield nor Dr. Calhoun ever opened the leg and obtained an actual sight of it. So far as their testimony goes it was simply their opinion that there was a fracture. But Dr. La Place did open the leg down to the bone, and cut away a considerable quantity of decayed bone and he said there was no evidence of fracture.

From the foregoing review of the testimony it is perfectly manifest that, so far as the plaintiff's theory of the case is concerned, his right of recovery depended upon whether there ever was an actual fracture of the leg. If there was not there is not a spark of testimony in the case upon which a recovery could be based. This being so the question arises, was the case sufficiently presented to the jury in the charge of the learned court below to enable them to appreciate the real matters of contention, and to intelligently decide the cause on its facts. In the statement of mere general principles, and of the duties of the parties respectively as to the burden of proof, and the rule as to contributory negligence the charge was correct. But whether it was adequate in view of the precise character of the contro-

versy and of the state of the testimony, is another question. For instance it is at once apparent that there was a very severe and fundamental contradiction in the testimony of the witnesses upon the vital question of fracture. Two surgical witnesses testifying from actual examination, declared that there was an actual compound fracture, one of both bones of the leg and the other of the tibia. But on the other hand three surgical witnesses for the defendant testifying also from an earlier and more complete and thorough examination, several times repeated, declared most positively and emphatically that there was no fracture whatever of either bone. Two experts who examined the leg a year or more later testified that in their opinion there had been a fracture. But on the other hand nine experts who also made examinations at the later date, declared that in their opinion there was not, and never had been a fracture. This included the defendant and Dr. McClelland. When the testimony of the latter is examined critically, it is found to be much more full, more detailed, more specific, accompanied by more comprehensive reasoning, and to have been given, at least as to some of them, by gentlemen of far greater experience and means of observation, than was possessed by any of the plaintiff's experts.

And all this is followed by the testimony of one witness who was examined at first on behalf of the plaintiff and then for the defendant, and who fully sustains the views of the defendant's experts, and testifies also that the plaintiff was affected by an independent disease which accounts for all the symptoms and conditions.

Upon reading the charge in its entirety we find it does not contain a solitary reference to the fact that there was any contradiction in the testimony of the witnesses, or that there was any opposition of views among the surgical experts, nor any reference to the weight of the testimony on the two sides, nor to the character of it. There is no explanation of it as being expert testimony, nor as to what that kind of testimony is, or what effect may or should be given to it in determining the case. Nor is there any statement or explanation as to how the jury should reconcile the contradictions if they could, or if they could not then how they should regard it or act in relation to it. As the fate of the case in the hands of the jury absolutely

depended upon the surgical testimony, there certainly should have been instructions upon that subject so as to enlighten the jury as to their duty in regard to it. Then too there should have been a presentation of just what the issue was, a statement of the matter of fact upon which the case turned, as for instance that the question of fact which they were to consider was whether there was a fracture of the leg in point of fact, or not, and also whether the treatment administered by the defendant to the plaintiff was in accordance with the usual and ordinary treatment practiced by competent surgeons in such cases. Instead of this the chief tenor of the charge was, that the jury should determine generally whether the defendant was negligent in his treatment of the case, and while they were told they should determine whether there was a fracture, there was no explanation as to how that question arose under the testimony and in what way they were to consider or apply the testimony. As the actual fracture was not seen, it was only a matter of opinion whether it existed at all, and the value of the particular testimony depended upon the competency of the witness to form a reliable opinion, upon the extent and character of the examination he made, upon the reasons given by him in support of his opinion and upon their judgment as to the weight and character of the testimony submitted on both sides in support of the respective contentions. All this should have been explained to the jury with suitable comments and instructions sufficient at least to get them on the right track of inquiry and deliberation. The case is peculiar. It is nothing like cases in which mere facts, or events of actual occurrence, are described, or even the conduct and declarations of parties, but where the opinions of witnesses as to whether a given condition or state of fact exists are very largely, almost entirely, to be depended upon. In the case of Tietz v. Phila. Traction Co., 169 Pa. 516, we held that a charge is inadequate which does not fairly present the whole case to the jury with a clear statement of the rules of law applicable to the questions involved. We think the charge was not an adequate presentation of the case to the jury and therefore sustain the nineteenth assignment of error. We think that the eighteenth assignment is also sustained. The part of the charge complained of here, was an attempt to distinguish between the injury to the plaintiff, supposing he

was negligently treated up to the time of his leaving the hospital, and the injury which resulted from his own negligence in leaving the hospital when he did, and his subsequently going to Wilkinsburg, remaining there five days without any treatment, and then traveling to Bedford, upwards of two hundred miles distant, for further treatment. That the plaintiff's act of leaving the hospital at the time he did and in the condition he was then, was an act of negligence on his part, cannot be questioned. Now his subsequent conduct in traveling to Wilkinsburg and Bedford, if it resulted in the severe consequences that followed, was still more negligent according to the universal testimony of all the surgeons. Whether he would have been cured if he had remained at the hospital a longer time, as Dr. Marshall testified he would have been, cannot now be known because of his own voluntary act of leaving.

It is impossible, therefore, to distinguish between the consequences which resulted from his ultimate act of leaving, and those which might have resulted if he had remained. He might have been cured if he had remained, or he might not, and it is not possible now to determine that question. But that impossibility results from his own action, and therefore no distinction can be made, as the source of a right of action, between the consequences which might have happened had he remained and the consequences which did happen after his departure. The idea of the charge was that if the plaintiff was negligent after leaving, and therefore could not recover, he still could recover for his suffering and pain while he was at the hospital. The answer to that is that it is not possible to determine that question, because, notwithstanding his subsequent sufferings he might have recovered if he had remained. Now as to his subsequent contributory negligence the evidence is simply overwhelming and is really not contradicted. Nearly all the surgeons were inquired of as to that, and they all concurred in their views. Even Dr. Enfield admitted that his traveling from the hospital to Wilkinsburg, and from there to Bedford, would have a very bad effect upon the patient. He was asked, after describing in the question the journey and the use of the leg, and the effect upon it, "Q. and the bones would cut through the flesh? A. They might. Q. Well they did it, didn't they? A. Well there was a hole there. Q. And wouldn't everything

you saw in relation to that man's condition, as he came to you at Bedford, be explainable upon the idea that in this traveling and this motion the fragments had cut themselves through the skin?   A. It might have produced the result, yes, sir.   Q. And didn't you swear on the last trial of this case, ' The bones would cut as Richards was walking around and moving the limb, the ends of ' the bones would cut as the muscles would contract, would draw apart and injure the soft parts, and open the skin to the outside, by which germs would get in there and produce the condition I found him in '?   A. Yes, sir, that is correct. . . . Q. Could fragments of the bone cut their way through the flesh in less than six days and hasten blood poisoning?   A. Yes, sir. Q. Was the inflamed condition of the wound, the death of the bone and blood poisoning attributable to inflammation, caused by the moving of his limb about, laceration and abscesses and entrance of air to the injury?   A. I think so, yes, sir."

Dr. Hartmeyer was asked a long question which described the movements of the plaintiff after leaving the hospital as testified by himself, and at the conclusion he was asked, "Did the action of the plaintiff contribute to produce his condition, as found by the doctors on his arrival at Bedford, and subsequent thereto?   A. Well, most emphatically.   If the man only had an injured joint, if he had an inflammatory action there at all, that would be, I consider, almost suicidal for a man to attempt anything of that kind, and, if a fracture existed, as a matter of course it would be a great deal worse.   Q. What would you say as to the possibility of a man making a trip, and making the movements as I have described them?   A. What do you calculate in the possibility, fracture as described in this case? Q. Yes.   A. Well I don't know anything about a man's physical endurance, but it doesn't seem possible to me that a human being would be able to undertake an action of that kind."   The witness then explained at length the reasons why it could not be done.

Dr. Hamilton was asked the same long question as Dr. Hartmeyer and his answer was, "Assuming that he had that condition of limb and that he survived and did all those things it is a wonder he is alive."   And again, "I think the action of the patient in leaving the hospital was very injurious to his limb and was the cause of his condition at present.   I can't

think otherwise." He further testified that he did not believe the plaintiff had any fracture because he could not possibly make such a journey if he had.

Dr. McClelland was asked the same question, concluding with the inquiry whether the journey contributed to the condition in which the plaintiff was when he reached Bedford, and his reply was, " My opinion would be that that would be entirely sufficient to account for the conditions that were found by Dr. Enfield at the end of the journey." He gave his reasons in detail, and further testified that he did not believe there was any fracture because if there was the plaintiff could not have made such a journey. Dr. Buchanan was asked the same question and made a similar answer. Dr. Murdock was asked the same question, and in reply to that part of it which inquired, whether the action of the plaintiff contributed to produce the condition as found by Dr. Enfield, on the arrival of the plaintiff at Bedford, he answered, " It certainly would, sir." He also said there was no fracture because it would have been utterly impossible to have made the journey if the plaintiff had such a fracture at the time.

Dr. King also said in reply to the same question, " Yes, sir, the travel would do that." When asked to give his reasons he said, " Well if he had a fracture without a splint on, the movement of the fracture caused by his traveling would so irritate the surrounding parts that inflammation would set up, and the probability is that owing to the proximity of the artery of the foot to these fragments, admitting that it was a fracture, the sharp edges of these fragments would probably cut off the artery or at least endanger it, at any rate it would get up such an inflammation that the foot would be gangrenous, it would produce gangrene of the foot provided he went through all you detailed." Dr. Dickson was asked the same question, concluding: " Did the action of the plaintiff, as stated, contribute to produce his condition as found by the doctor on his arrival at Bedford and subsequent thereto, assuming that the plaintiff did take this trip and was able to take it? A. Most undoubtedly the action of the party would be contributory to the condition."

Against all this formidable array of testimony there was not a single fact or opinion given in evidence. It was entirely

uncontradicted. It was manifestly impossible to set up a dividing line at the time the plaintiff left the hospital and attempt to separate those consequences of alleged negligent treatment of the defendant, which occurred prior to the plaintiff's leaving the hospital, from the ulterior consequences resulting from the plaintiff's contributory negligence after he left. It is impossible to set up a standard because it is impossible to know what would have been the result of the defendant's treatment if the plaintiff had remained at the hospital. The eighteenth assignment is sustained. The same reasoning applies to the fifteenth assignment, which is sustained. The sixteenth assignment is sustained because there is no evidence in the case which raises such a question. The fourteenth assignment is not sustained because the court was right in leaving the whole subject of what was said by the nurse to the jury. The nurse did not say explicitly that she told the plaintiff what reply the doctor had made as to the plaintiff's leaving the hospital when he did. She implied that she repeated the doctor's answer to the plaintiff, but she did not say so, and she was not asked the distinct question whether she did or not, and as to the eleventh assignment it is clearly not correct to argue that the plaintiff did not say that the doctor told him he could go home, because he did so testify. In his testimony however he did not say that the doctor told him he was cured, and in that respect the court was in error. Technically the court was in error in not stating the language of the witness with precision, but the more serious error was in not stating that the doctor denied having said in any manner, or in any words, that the plaintiff might leave. If there were no other reason for reversing we would not reverse on this ground alone, but as there was technical error in what the court did say we sustain this assignment. We do not sustain the second assignment because we think the answer of the court to the defendant's second point was substantially correct. We do not sustain the fourth assignment for the same reason. The matter of the fifth assignment was for the jury and therefore we cannot sustain it.

The defendant was not entitled to the affirmance of his sixth point, simply because Miss Blosser did not distinctly say that she repeated to the plaintiff the words of the defendant, to wit, that if he left the hospital he did so on his own responsibility.

She was not asked the question distinctly whether she did or not. She did say that Dr. Willard said those words to her but omitted to say that she repeated them to the plaintiff, and therefore the defendant's sixth point could not be affirmed. The answer to the plaintiff's third point was of no consequence and moreover it was correct in law, and we cannot sustain the seventh assignment.

We think the plaintiff must be held responsible for the consequences of omitting to have medical treatment after he left the hospital, and for his travel to Wilkinsburg and Bedford. He did not advise with the defendant as to those matters, and he cannot hold the defendant responsible for his own voluntary acts in relation thereto. The answer to the plaintiff's fifth point therefore, broadly affirming it as it stood, was erroneous, and hence we sustain the eighth assignment. The ninth and tenth assignments are not sustained, nor the twelfth, because they are without merit. We think the portion of the charge complained of in the thirteenth assignment was not erroneous and therefore that assignment is not sustained. The seventeenth, twentieth, twenty-first, twenty-second and twenty-third assignments are not sustained. This disposes of all the assignments except the first and third.

After a painstaking, careful and minute study of the testimony in this case we are constrained to say that we regard the verdict of the jury as an outrage upon the administration of justice. There was no aspect of the testimony upon which it could be justified for any such amount, in any event. The plaintiff's case at the very best was of the most doubtful character. No verdict could be sustained at all except by striking down the testimony of ten entirely competent, disinterested witnesses, and accepting in its place the testimony of two witnesses who, whatever may be their personal merits, did not possess a tithe of the experience or means of observation enjoyed by the defendant's witnesses. As to three of these who personally saw, and carefully and frequently examined the plaintiff's leg immediately after the accident, when it could be best observed and considered, their testimony was absolute and positive that there was no fracture. They were all disinterested, entirely capable and, two of them at least, having a very large experience in this class of cases, and there is no reason dis-

coverable in the testimony why their judgment and their evidence should be rejected in order to give place to the opposing testimony of two of the plaintiff's witnesses, one of whom did not see the patient until eighteen days after the accident, and the other not until forty-eight days had elapsed. In the meantime the plaintiff's conduct and action were such that even a fracture might have supervened on that account, but the most experienced and competent of the defendant's witnesses were of opinion, and so testified, that every condition of the leg as seen by Dr. Enfield at Bedford could easily be accounted for by the conduct of the plaintiff after he left the hospital.

On the subject of the plaintiff's contributory negligence in this regard there was no disputed testimony. It was established by all the evidence in the case, including that of the plaintiff's witness, Dr. Enfield. No opinion of any witness was given to the contrary and it was therefore an undisputed fact in the case. The learned court below very properly charged the jury that if the plaintiff's conduct was such, after leaving the hospital, as to contribute to his condition, he could not recover for such consequences as happened after he left the hospital. But the evidence being entirely undisputed on that subject, it must be regarded as establishing the fact of contributory negligence on the part of the plaintiff, and hence the first and third points of the defendant should have been affirmed, and the case withdrawn from the jury. The learned court showed its appreciation of the verdict by promptly striking down two thirds of its amount, and might with still greater propriety have set the verdict aside altogether because of its being against the law and the evidence, and grossly excessive in amount.

It must not be overlooked that the medical and surgical service rendered by the defendant to the plaintiff was entirely gratuitous, the defendant receiving therefor no compensation of any kind. For many years Dr. Willard had been rendering such service to the hospital to which the plaintiff was brought after receiving his injury. He was one of a corps of physicians who, from motives of benevolence and charity, contribute, as they do in many other cities and towns, their time, their skill, their labor and their most valuable and humane service in relief of the sickness and suffering of their race. If such gentlemen are to be harassed with actions for damages when they do not happen to

cure a patient and are to incur the hazard of having their estates swept away from them by the verdicts of irresponsible juries, who, caring nothing for law, nothing for evidence, nothing for justice, nothing for the plain teachings of common sense, choose to gratify their prejudices or their passions by plundering their fellow citizens in the forms of law, it may well be doubted whether our hospitals and other charitable institutions will be able to obtain the gratuitous and valuable service of these unselfish and charitable men. It is much more than probable that if this plaintiff had been content to remain at the hospital a week or two longer he would have been cured of his hurt. Because he would not submit to such a reasonable detention he apparently brought upon himself all his subsequent sufferings. If he chooses to take such risks he must take the consequences himself.

The plain truth is that this plaintiff was probably afflicted with a tendency to tuberculosis, and when he received his injury that tendency became developed in the bones of his leg, and the disease called tuberculosis of the bone fastened upon him at the seat of the injury. Dr. La Place held to this theory and treated him for it with success. When this witness testified for the plaintiff he was asked: " Q. Were there any broken bones in the limb; had there been a fracture? A. No evidence of it at the time of my examination." Continuing he said, " No particular bone was injured so far as was evidenced at the time of my examination ; at that time I discovered a tuberculous inflammation involving the totality of the ankle joint, extending into the substance of the lower end of the tibia and astragalus, disintegrating these and causing small pieces of bone to drop off from them with the rest of the products of inflammation." On the second trial he testified, " What we mean by tuberculosis arthetis is this : There is such a disease as tuberculosis, that is very widely disseminated in nature. Sometimes it develops in people's lungs and that is called consumption, and when it develops in a man's ankle it is called a tuberculosed arthetis. Now in this patient's case he had all the predisposition that a patient has to develop consumption, but inasmuch as he injured his ankle that spot, that is the ankle, became the weakest spot in his body and having the predisposition to develop tuberculosis he developed tuberculosis of the

ankle joint." . . . . " What I had there was tuberculous disease; there was no evidence of the fracture, there was no play of the bones at all, everything was united and solid and I didn't care whether he had had a fracture or not; that didn't enter into the case. He had tuberculosis of the joint. He came there to be treated for tuberculosis of the joint, and that I did for him."

The foregoing theory is the only one that will satisfy all the facts in evidence.

Judgment reversed.