[Civ. No. 20238.   Second Dist., Div. Two.   July 20, 1955.]

FRANCES AGNEW, Respondent, v. CITY OF LOS ANGELES et al., Defendants; EDWIN LARSON, Appellant.

Harold B. Pool for Appellant.

Betty & Campbell, Marion P. Betty and Lionel T. Campbell for Respondent.

MOORE, P. J.—Here is an action for malpractice. This is the third appeal. The first resulted in the reversal of a judgment of nonsuit (82 Cal.App.2d 616 [186 P.2d 450]) ; the second, in the reversal of judgment for defendant (97 Cal. App.2d 557 [218 P.2d 66]) by reason of errors in excluding the testimony of certain experts. The instant judgment authorized plaintiff's recovery of $37,883.91 and costs.

Appellant is a licensed physician and surgeon. He had administered to respondent from time to time during the 23 years preceding her accident on March 3, 1943. At that time she was 51 years of age. While walking on Hollywood Boulevard she slipped and fell on some wet leaves. She was taken to the lobby of a nearby hotel where she telephoned appellant's office. She was advised of his absence and thereupon visited the receiving hospital where her injuries were examined and she was sent home in a conveyance.

Having suffered all night, the following morning she informed appellant of the circumstances of her fall and that she believed her right hip bone was broken. He told her the hospital report indicated that she had suffered only a bruise; that he did not have time to visit her then; that she should take doses of anacin and hot baths, and rest and keep a pillow under her knee. In three subsequent conversations she informed appellant that her pain was increasing, suggested that she should be in a hospital because of her inability to care for herself and pointed to the fact that her leg was turning out. Thereupon, appellant replied that a bruise is

very painful; that she would be up and about in a few weeks and that it was not necessary for her to be confined in a hospital.

On the eighth day after her fall and before appellant examined her, while leaning against a table she heard her injured hip bone crack. She was promptly transported to the hospital where appellant commenced to administer to her and continued until December 10, 1943. The X-ray films disclosed that the unfortunate lady had suffered a displaced fracture of the right femur with rotation of the head. Late in October, her knee began to pain her with increasing pangs in her hip. Appellant advised continued activity and exercise as remedial measures. Displeased with her lack of progress toward recovery, respondent learned from other physicians that aseptic necrosis of the head of the femur had developed and that permanent disability had set in.

In presenting her grievance to the trial court, respondent pleaded and successfully contended that appellant had been negligent in his failure to have X-rays made immediately after her fall on March 3d; in advising her to bear her weight on the injured leg too soon after the setting of the fracture on March 11; in advising her to bear weight on the limb in October while she was complaining of pain. The jury having adopted the evidence in support of her contentions and having assessed her damage by their verdict, judgment was entered from which comes this appeal.

Practically the only attack upon the judgment is that prejudicial error was committed in allowing two physicians to testify as experts on the aseptic necrosis, a condition allegedly caused by appellant's neglect of respondent after her fall on March 3, 1943. One of those experts was Dr. Vernon L. Andrews, the other was Dr. Wendell White. There was no disqualification of either. In the former trial, Dr. Andrews attempted to testify on behalf of plaintiff. The trial court rejected him as a witness on the ground that, although he was a specialist in pathology, he did not have the required professional knowledge and learning of, and skill with reference to the subject under inquiry and was not familiar with the standards required of physicians under similar circumstances. But on appeal, Division Three of this court declared that "his qualifications far exceed those of the average physician . . . The fact that Dr. Andrews was a specialist in pathology does not, in and of itself, render him incompetent as a medical expert . . . The basic medical question pre-

sented to Dr. Andrews related to the subject of aseptic necrosis
. . . he was fully competent to give the jury his opinion as to
the cause of aseptic necrosis generally and as to the cause
in the present case. . . . Where a witness has disclosed suffi-
cient knowledge of the subject to entitle his opinion to go
to the jury, the question of the degree of his knowledge goes
more to the weight of the evidence than its admissibility.''
(*Agnew* v. *City of Los Angeles,* 97 Cal.App.2d 557, 565-566
[218 P.2d 66].)

Therefore, the qualification of Dr. Andrews is determined
by the law of the case and nothing has occurred to defeat its
applicability.    A rehearsal of all his testimony as to his
learning or experience or of the arguments of counsel thereon
could add nothing to the decision quoted from 97 Cal.App.2d.
The doctor testified that he had done a general practice for
47 years; was familiar with the standard required of physi-
cians under similar circumstances and with the standard of
care in Los Angeles in the treatment of fractured femurs;
had had daily experience, consultations with other doctors
about their cases; had made tests, assisted at operations, ob-
served and discussed fractures of the neck of the femur and
aseptic necrosis of the head of the femur and various types of
necrosis.    In view of his vast learning and technical training
and of the decision on the second appeal, it would be sheer
folly now to disturb the finding of his qualification.    Neither
the arguments of appellant nor the contents of *Huffman* v.
*Lindquist,* 37 Cal.2d 465 [234 P.2d 34, 29 A.L.R.2d 485], and
*Sinz* v. *Owens,* 33 Cal.2d 749 [205 P.2d 3, 8 A.L.R.2d 757],
reveal a good reason for disturbing the finding of the trial
court.    Contrary to appellant's contention, Dr. Andrews had
not only his advanced learning and general experience, but
he added to it a long ''occupational experience''* in daily
serving, and collaborating with ''physicians under circum-
stances similar to those which confronted'' appellant herein.
Dr. Andrews testified that he was familiar with the standard
of care in vogue in Los Angeles at the time of respondent's
injury, in regard to the treatment of fractured femurs and
fractures of the neck of the femur.

The other expert witness called by respondent was Dr.
Wendell White who has been a licensed physician in California
since 1912 and has done a general practice.    He has treated
broken bones including more than 25 hip fractures, two of

*See 2 Wigmore on Evidence, third edition, 556, 635.

which were under his care at the time of his testimony in this action. He takes care of fractures of the neck of the femur. He administered to respondent in 1951. He testified that it is common and necessary practice to utilize X-rays for the purpose of determining the condition of fractured bones; that he was familiar with the practice, in Los Angeles, of the treatment of fractured necks of femurs in 1943. He had examined the 1943 X-ray pictures of respondent's injured bone in the presence of the jury; showed there was a fracture of the neck of the femur within the capsule, the cartilaginous socket for the head of the femur; showed the external turning of the foot and leg; a shortening and overlapping at the neck of the femur; the shaft was displaced upwards for about half an inch and rotated laterally; she suffered an intracapsular fracture of the neck of the femur; the blood supply to the fracture came from the blood vessels around the joint; the capsule has no circulation of its own.

Dr. White testified over the general objection that he had read all the X-rays and X-ray reports and had examined respondent; that she is a permanent cripple and will be compelled to wear a brace the rest of her life; that between March 4 and March 11, 1943, appellant did not exercise that degree of care, skill, knowledge and judgment ordinarily possessed and exercised by reputable physicians and surgeons practicing in Los Angeles in similar cases; he did not see the patient, but took the word of a doctor at the receiving hospital; although she complained of excruciating pain and of an eversion of her foot, he did not have X-ray pictures made or send her to the hospital and that such measures would have been standard care of reputable physicians. A personal examination should have been made. She had to move about in her room by holding onto furniture; she took baths and had massages over the hip on the doctor's advice, contrary to the standard of care maintained in Los Angeles. With infinite detail, Dr. White explained the significance of the reports and shadowgraphs of the injury and testified that appellant failed to use that degree of care and skill, learning and judgment of reputable doctors in Los Angeles at that time in the treatment of similar cases.

Therefore, if the testimony of Dr. Andrews were stricken from the record, here is a reservoir of intelligent proof of appellant's negligence. But no evidence is stricken. We have the positive proof from two learned and skillful physicians that appellant did not, in his care of respondent, observe

the customary standard of practice required; that such neglect is the proximate medical cause of the development of aseptic necrosis and her crippled condition; that such necrosis would not have resulted had her limb been immobilized and the proper standard of care otherwise been observed by appellant. With that situation, what must be the decision of this court?

On many features of the treatment of respondent and the appearance of aseptic necrosis, respondent's evidence is supported by the testimony of appellant's witnesses. But whether they were supported by other proof or not, it is the law that a judgment when supported by substantial evidence will not be disturbed on appeal. ■ "The power of the appellate court begins and ends with a determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the conclusion reached by the jury." (*Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427, 429 [45 P.2d 183].) ■ All legitimate and reasonable inferences must be indulged in support of the verdict. (*Juchert* v. *California Water Service Co.*, 16 Cal.2d 500, 503 [106 P.2d 886].) ■ If there is a reasonable doubt that the evidence is sufficient, the reviewing court must resolve that doubt in favor of the judgment. (*Estate of Bristol*, 23 Cal.2d 221, 223 [143 P.2d 689].) ■ When two or more inferences can be reasonably deduced from the facts, the appellate court is without power to substitute its deductions for those of the trial court. (*Treadwell* v. *Nickel*, 194 Cal. 243, 260 [228 P. 25].) As triers of fact, it was necessary for the jury to determine which version of the conduct of appellant should be accepted as true; since they made their finding against appellant, it is incumbent upon this court to accept as true the evidence in favor of respondent and to resolve all conflicts in the evidence in her favor. (*Hinkle* v. *Southern Pac. Co.*, 12 Cal.2d 691, 695 [87 P.2d 349].)

Appellant's authorities are distinguishable. *Lippold* v. *Kidd*, 126 Ore. 160 [269 P. 210, 59 A.L.R. 875], concerns an eye injury where the foreign body imbedded in the eye was not discovered until seven months later. In deciding for defendant, the court stated that plaintiff's witnesses had given the jury no formula by which they could determine whether the injury to the eye would eventually destroy its usefulness. In the case at bar, Dr. Andrews laid out a comprehensive outline of the results that would follow if pressure should be applied to a broken femur. His expert medical knowledge was applied in detail to the facts before the jury

and they chose to believe his explanation. The court further states in *Lippold* v. *Kidd, supra,* "as we have said before, certainty is not required; probability will suffice." Thus the issue of proximate cause is handled in such a way as to give no solace to appellant here.

*Huffman* v. *Lindquist, supra,* involved a death where the deceased, while suffering a skull fracture, died of a blood clot in the lungs. It was contended that defendant's negligence in not properly diagnosing the hemorrhage caused by the fracture brought on the death. Evidence was introduced that " 'there was nothing to be done that was not being done.' No evidence was produced in contradiction of this testimony." The situation there in no respects parallels those at bar. (P. 474.)

The law is clear as to proximate cause. (*Ross* v. *Baldwin,* 44 Cal.App.2d 433, 436 [112 P.2d 666].) The jury here was given a basic simple formula by which they could judge the case before them. ▊ The law requires only proof of reasonable probability to establish proximate cause. ▊ The negligence of the appellant does not have to be the sole proximate cause of the injury so long as it is *a* proximate cause. The respondent proved to the satisfaction of the court and jury that appellant's negligence was the proximate cause of her permanent disability and such a decision is solely within the province of the jury. (*People* v. *Miller,* 51 Cal.App. 189, 190 [196 P. 283].) ▊ The evidence proved that the negligence of appellant was a proximate cause of respondent's necrosis and that is sufficient to establish appellant's liability. (*Ross* v. *Baldwin, supra.*)

Judgment affirmed.

McComb, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 15, 1955.