Smith, Appellant, *v.* Yohe.
Smith, Appellant, *v.* Gailey.

96

Argued May 27, 1963. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Frank B. Boyle,* with him *Donald Yost,* for appellants.

*Arthur Markowitz,* with him *Markowitz, Kagen & Griffith,* for Dr. William C. Yohe, appellee.

*Robert J. Stewart,* with him *Spencer R. Liverant,* and *Liverant & Stewart,* for Dr. Herman A. Gailey, Jr., appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, October 9, 1963:

These appeals challenge the propriety of the action of the court below in refusing to remove compulsory nonsuits entered at the trial of two malpractice actions.

On March 10, 1959, Joseph Smith (Mr. Smith), 70 years of age and convalescing from a stroke which had left him with a spastic paralysis of his right side, slipped and fell in his home. Dr. W. C. Yohe, Mr.

Smith's family physician, was summoned and he made an examination of Mr. Smith during which, according to his testimony, he found an increased tightening by spasm of the handstring muscles on the right side. Dr. Yohe gave Mr. Smith an injection and medication to reduce his pain and prescribed bed rest. After several visits, Dr. Yohe recommended that Mr. Smith be given physical therapy[1] consisting of massage and muscle exercises to relieve the spastic condition.

On March 21, 1959, 11 days after the fall, at the family's insistence, Mr. Smith was admitted to the York Hospital, York, Pa., where he was X-rayed for the first time. At that time, Mr. Smith's right leg was turned outward and completely paralyzed. The X-rays revealed a fracture of the right femur, asceptic necrosis and a generalized demineralization of the pelvic bones. At the hospital Mr. Smith became a patient of Dr. H. A. Gailey, Jr., an orthopedic surgeon. Dr. Gailey twice tried to insert a Smith-Petersen nail in the hip to hold the fracture and, on each occasion, the device became dislocated and his efforts unsuccessful. Dr. Gailey then inserted a Steinman pin in the tibia to enable the leg to be held in an immobile position. It is claimed that, by reason of Dr. Yohe's and Dr. Gailey's treatment, the injuries were aggravated requiring long periods of hospitalization and resultant severe pain, permanent disability and disfigurement.

Malpractice actions were later instituted in the Court of Common Pleas of York County by Mr. Smith against Drs. Yohe and Gailey;[2] both actions were consolidated and tried. At the conclusion of the testimony presented on behalf of Smith, the court entered

---

[1] The testimony is conflicting as to whether Dr. Yohe ordered Mr. Smith's family to have him do any walking.

[2] During the pendency of these actions, Mr. Smith died and his son and personal representative, Allen Smith (Smith), was substituted as plaintiff in both actions.

compulsory nonsuits in both actions. Motions to remove these nonsuits were refused and these appeals were taken.

## Smith v. Dr. Yohe

The negligence alleged against Dr. Yohe is that he erroneously diagnosed Mr. Smith's injuries by reason of his failure to use X-rays in discovering and treating what turned out to be a fractured hip. On these appeals it is contended that the court below erred in the following respects: (a) the court failed to rule that Dr. Yohe's failure to take X-rays was negligence as a matter of law; (b) the court ruled that, since Smith failed to produce any expert medical testimony, there was no jury issue; (c) the court erred in refusing to permit a physician from another locality to testify; (d) the court ruled that certain efforts of Smith to obtain local expert testimony were inadmissible in evidence.

### A. The Failure to Use X-rays

Smith's contention is that, in view of the factual situation presented, the proof that Dr. Yohe failed to employ X-rays as an aid to the diagnosis of Mr. Smith's condition presented a prima facie case of negligence which the trial court should have submitted to the jury.

In considering this contention certain well settled principles in this area of the law must be kept in mind: (a) in the absence of a special contract, a physician neither warrants a cure nor guarantees the result of his treatment *(Donaldson v. Maffucci,* 397 Pa. 548, 553, 156 A. 2d 835, and cases cited therein); (b) "A physician who is not a specialist is required to *possess* and *employ* in the[diagnosis and] treatment of a patient the skill and knowledge usually possessed by physicians [of good standing] in the same or a similar locality, giving due regard to the advanced state of the profession at the time of the treatment;

and in employing the required skill and knowledge he is also required to exercise the care and judgment of a reasonable man" *(Donaldson v. Maffucci,* supra, 553, 554); (c) the burden of proof is upon the plaintiff to prove either (1) that the physician did not possess and employ the required skill or knowledge or (2) that he did not exercise the care and judgment of a reasonable man in like circumstances *(Donaldson v. Maffucci,* supra, 554); (d) the doctrines of res ipsa loquitur and exclusive control are not applicable in this area of the law *(Demchuk v. Bralow,* 404 Pa. 100, 104, 105, 170 A. 2d 868; *Robinson v. Wirts,* 387 Pa. 291, 294, 295, 127 A. 2d 706 and cases therein cited); (e) in malpractice cases which involve an appraisal of the care and skill of a physician a lay jury presumably lacks the necessary knowledge and experience to render an intelligent decision without expert testimony and must be guided by such expert testimony *(Robinson v. Wirts,* supra, 292);[3] (f) the *only* exception to the requirement that expert testimony must be produced is "where the matter under investigation is so simple, and the lack of skill or want of care so obvious, as to be within the range of the ordinary experience and comprehension of even nonprofessional persons . . ." *(Robinson v. Wirts,* supra, 297);[4] (g) a physician is not liable for an error of judgment *(Ward v. Garvin,* 328 Pa. 395, 195 A. 885; *Duckworth*

---

[3] The rationale of this rule was well stated in *Tefft v. Wilcox,* 6 Kan. 46, 59: "This evidence must, from the very nature of the case, come from experts, as other witnesses are not competent to give it, nor are juries supposed to be conversant with what is peculiar to the science and practice of the professions of medicine and surgery to that degree that will enable them to dispense with all explanations."

[4] Examples given are where gauzes are left in a patient's body, where a dentist's tool slips permitting the rotating tool to remain in the patient's mouth, where a surgeon stitching a cheek thrusts a needle into the eye of the patient, etc.

*v. Bennett,* 320 Pa. 47, 181 A. 558; *Williams v. LeBar,* 141 Pa. 149, 21 A. 525) ; (h) if a physician employs the required judgment and care in arriving at his diagnosis, the mere fact that he erred in his diagnosis will not render him liable, even though his treatment is not proper for the condition that actually exists *(Richards v. Willard,* 176 Pa. 181, 35 A. 114 (fracture as a sprain) ) ; *Duckworth v. Bennett,* supra (fracture as arthritis) ; *Ward v. Garvin,* supra (wrong diagnosis of injury to foot).[5]

With these principles in mind, we turn to the situation in the case at bar. Smith, not challenging Dr. Yohe's general qualifications, contends that Dr. Yohe, in diagnosing the condition of Mr. Smith, did not use the requisite judgment and care in arriving at such diagnosis in that he failed to take, or have taken, X-rays. Such failure to have X-rays taken of Mr. Smith, it is urged, presents a situation wherein no expert testimony is required and the failure to use X-rays *under the instant factual situation* presents a prima facie case of negligence in that the lack of judgment and care of Dr. Yohe in arriving at his diagnosis is so obvious as to be within the understanding, comprehension and common knowledge of a lay jury.

In some jurisdictions, courts have held that the failure on the part of a physician to take X-rays as an aid to diagnosis, when such X-rays are available, may present per se a prima facie case of negligence: *James v. Grigsby,* 114 Kan. 627, 220 P. 267; *Howell v. Jackson,* 65 Ga. App. 422, 16 S.E. 2d 45. In *Agnew v. Los Angeles,* 82 Cal. App. 2d 616, 186 P. 2d 450,[6] the Court said (p. 451): "The use of the X-ray as an aid to diagnosis in cases of fracture or other indicated cases is a matter of common knowledge, and the failure to

---

[5] Cf: *Hodgson v. Bigelow,* 335 Pa. 497, 7 A. 2d 338.

[6] Same case: 97 Cal. App. 2d 557, 218 P. 2d 66 and 134 Cal. App. 2d 433, 286 P. 2d 556.

make use thereof in such a case amounts to a failure to use that degree of care and diligence ordinarily used by physicians of good standing practicing in this community. *The court in the absence of expert testimony may take judicial notice of this fact.* [citing other California cases]." (Emphasis supplied) To the same effect: *Wilson v. Corbin,* 241 Ia. 593, 41 N.W. 2d 702. See also: *Whitson v. Hillis,* 55 N.D. 797, 215 N.W. 480; *Flock v. J. C. Palumbo Fruit Co.,* 63 Idaho 220, 118 P. 2d 707; *Peterson v. Hunt,* 197 Wash. 255, 84 P. 2d 999. In *Butts v. Watts* (Ky.), 290 S.W. 2d 777, 780, 781, the Court stated: "In this day and time the use of X-ray apparatus . . . and what its use ordinarily reveals are so well known as to be within common knowledge and frequent experience of laymen. . . . In the circumstances shown, the jury could well believe that [failure to use X-rays] was a factor to be taken into account on the overall question of postoperative negligence without having an expert tell them so." By way of analogy, it might be noted that the Court in *Corn v. French,* 71 Nev. 280, 289 P. 2d 173, 179, held that: ". . . without expert medical testimony, a jury might from its own common knowledge and experience, recognize the use of biopsy or pathological examination and microscopic analysis of tissue as a common and accepted diagnostic practice in determining the presence or absence of cancer."

On the other hand, courts in other jurisdictions have held that a physician may be held negligent for failing to take X-rays as an aid to diagnosis *only, if under the evidence, it is shown* "according to the tenets of the physician's school of medicine, or the usual practice in his locality, the circumstances presented were such as to require the physician . . . to resort to an X-ray examination": 162 A.L.R. 1295 and cases therein collected. For instance, it has been held that the failure to use X-rays is not "of itself" evidence of

negligence *(Shumacher v. Murray Hospital,* 58 Mont. 447, 193 P. 397); nor *necessarily* evidence of negligence *(Wright v. Conway,* 34 Wyo. 1, 241 P. 369); nor "such obvious negligence" as to enable a layman to find a departure from ordinary standards of care (*Boyce v. Brown,* 51 Ariz. 416, 77 P. 2d 455); and does not raise *an inference* of negligence *(Snearly v. Mc-Carthy,* 180 Iowa 81, 161 N.W. 108). The courts which hold this view require the production of expert testimony to prove that the failure to use X-rays was not in accordance with the standard of care and judgment of a physician of good standing in the same or a similar locality.

In Pennsylvania, the leading case on the subject is *Duckworth v. Bennett,* supra. In *Duckworth,* a sixteen year old boy, with a prior history of rheumatism, fell; the physician, who examined him two days later, diagnosed his condition as arthritis of the knee and prescribed bed rest as the result of which the swelling and inflammation of the knee improved; on a much later visit, the physician, while manipulating the leg, discovered a lack of full movement and then—nine weeks after the fall—advised an X-ray examination; the X-ray findings were disputed, a doctor on behalf of the boy testifying they revealed a fracture of the femur while doctors on behalf of the defendant-physician stated they revealed a separation of the epiphysis of the femur. On appeal from judgments for the physician, it was contended that the physician's failure to take X-rays was negligence. In affirming judgments for the physician, this Court said (p. 50): "We think it could not be held to be negligence or unskillful treatment for a doctor not immediately to employ the X-ray in his investigation of a patient's condition; whether this or another method of inquiry shall be resorted to is a matter of judgment, and a failure to use the one or the other could not be said to be negligence. Where

the most that the case discloses is an error of judgment on the surgeon's part, there is no liability: Williams v. LeBar, 141 Pa. 149, 159."[7]

Four years later, in *Hodgson v. Bigelow*, 335 Pa. 497, 7 A. 2d 338, the majority of this Court seemingly restricted an implication in *Duckworth* (p. 518): "The rule in Pennsylvania is *not* that 'for a mistake in diagnosis there is no liability', but it is that 'for a mistake in diagnosis *where the symptoms were obscure*' . . . there is no liability. [citing Duckworth]."

Factually, *Duckworth* differs from the case at bar. While in both cases the plaintiffs had sustained falls, the plaintiff in *Duckworth* was a 16 year old boy whose bone structure was much less prone to fracture than Mr. Smith, an elderly man, whose bones by reason of age would naturally be somewhat brittle. In *Duckworth*, the chief complaint of the patient to the physician was his knee and not his hip; measurements taken by the physician revealed no disparity of length, a fact which would tend to contraindicate any bone fracture; the pain in the hip area could be attributable to the knee condition; the knee, after treatment for six weeks by the physician, showed steady improvement; it was not until two months after the fall that the physician for the first time discovered a restriction of movement of the patient's leg and at that time he immediately ordered an X-ray examination. In *Duckworth*, there was nothing to place the doctor on notice, save the boy's fall, of any injury to the hip area which might suggest any possibility of a fracture in that area. In the case at bar, the patient was an elderly man, with a paralyzed right side, who fell and, in so doing,

---

[7] *Duckworth* has been cited with approval by this Court on other propositions (*Ward v. Garvin*, supra; *Bierstein v. Whitman*, 360 Pa. 537, 62 A. 2d 843; *Powell v. Risser*, 375 Pa. 60, 99 A. 2d 454; *Donaldson v. Maffucci*, supra). However, the question of the failure to use X-rays has not been raised since *Duckworth*.

his right leg became flexed; his fall was attended by severe and constant pain not only in the knee area but also the upper part of the leg and the hip; the physician made no measurement of the patient's leg, although, when the patient was finally hospitalized, his right leg was found to be shorter than the left; on manipulation of the right leg by the nurse a "crunching" noise in the hip area was noted and the right leg was turned outward. It is clear that in *Duckworth* any symptoms of a fracture of the hip were obscure and the pre-X-ray examinations of the doctor contraindicated any possibility of a hip fracture; in the case at bar, bearing in mind the age and health of the patient, the symptoms pointed, rather emphatically, to the possibility, if not the probability, of a fracture in the hip area.

It is to be noted that in *Hodgson* (p. 518) this Court classified a physician's failure to take X-rays as an aid to diagnosis as a "departure from established standards of practice" which, unless circumstantially justified, might make out a prima facie case of negligence against the physician.

In our view, the instant factual situation clearly raised the possibility that the fall of this elderly man might have resulted in bone fracture; under such circumstances, it was the physician's duty to take X-rays to determine the existence or nonexistence of any bone fractures. The circumstances here command an exception to the general rule which requires the production of expert testimony for it is a matter of common knowledge that the fall of an elderly person may be due to or accompanied by a fracture of the bony structure of the body; furthermore, when subsequent to such fall, the patient suffers severe pain, a "crunching" noise in the hip where the severe pain is centered, an outward turning of the leg and other symptoms, such symptoms point to the necessity for the use, in arriving at a diagnosis, of the commonly accepted method of fracture de-

tection, i.e., the X-ray. Resolution of the issue whether, under the instant circumstances, this physician, should have resorted to the use of X-rays as an aid in arriving at his diagnosis, requires no expert testimony; it is within the ken of every layman. It can be presumed that a jury has *some* knowledge in areas such as this even though doctors have *superior* knowledge. In this day and age, the average member of a jury has a general knowledge of the efficiency of X-rays as an aid to diagnosis together with the ability to evaluate whether the failure of the physician to take X-rays, under the presented facts, evidenced a lack of judgment and care in arriving at a diagnosis on the part of the physician.

Dr. Yohe urges that, even if he should have and did not take X-rays, such constituted an error of judgment for which he is not liable. In our opinion, there is a vast difference between an error of judgment and negligence in the collection and securing of factual data essential to arriving at a proper conclusion or judgment. If a physician, as an aid to his diagnosis, i.e., his judgment, does not avail himself of the scientific means and facilities open to him for the collection of the *best* factual data upon which to arrive at his diagnosis, the result is not an error of judgment but negligence in failing to secure an adequate factual basis upon which to support his diagnosis or judgment.

Even without expert testimony, Smith has shown a factual picture which presents a prima facie case of negligence. The court should have permitted the jury to pass upon the issue whether, under the circumstances, Dr. Yohe failed, by not resorting to the use of X-rays as an aid to his diagnosis, to exercise the requisite judgment and care.

In view of our conclusion, we need not pass upon the other questions presented by Smith. All of these questions go either to the necessity for expert testi-

mony, the qualifications of the proffered expert testimony or Smith's efforts to secure such testimony. We are of the opinion that, even without expert testimony, *on the facts here presented,* Smith has made out a prima facie case of negligence and a compulsory nonsuit should not have been entered.

Our conclusion in this case is not that in *every* situation the failure of a physician to use X-rays as an aid to diagnosis presents a prima facie case of negligence nor do we adopt the theory of judicial notice expounded in *Agnew,* supra. Our conclusion is that Dr. Yohe's failure to use X-rays *under the facts as presented in this case* presents a prima facie case of negligence.

As to Dr. Yohe, the order is reversed.

Smith v. Dr. Gailey

A. Was An Unauthorized Operation Performed by Dr. Gailey?

Smith charges that Dr. Gailey performed an unauthorized operation on (Mr. Smith) by inserting a Steinman pin in his tibia.

The principles of law applicable to this phase of the litigation are clear. Such principles are: (a) where a patient is mentally and physically able to consult about his condition, in the absence of an emergency, the consent of the patient is " ' " a prerequisite to a surgical operation by his physician" ' " and an operation without the patient's consent is a technical assault (*Moscicki v. Shor,* 107 Pa. Superior Ct. 192, 195, 163 A. 341; *Dicenzo v. Berg,* 340 Pa. 305, 307, 16 A. 2d 15); (b) the burden is on plaintiff to prove "that the operation performed, or substantially that operation, was not authorized by him": *Dicenzo v. Berg,* supra, 307.

In upholding the entry of a compulsory nonsuit against Smith as to Dr. Gailey the court below well

stated: ". . . [Smith] alleges that the last procedures performed by Dr. Gailey on the patient constituted an unauthorized operation. These consisted of a manipulation of the dislocated prosthesis back into place, application of a cast, and the insertion of a Steinman pin in the leg. Although [Smith] failed to establish it by proof there is no dispute that a Steinman pin is a metallic pin several inches long and a fraction of an inch in diameter which is inserted perpendicular to the leg through the shin bone between the knee and the ankle. It is used as a device to which to attach traction weights or other apparatus for the purpose of holding the leg in a particular position, and is removed after it has served its purpose. [Smith] contends that on behalf of the patient he had authorized [Dr. Gailey] only to manipulate the prosthesis back into place, and that the insertion of the Steinman pin constituted an unauthorized operation for which [Dr. Gailey] must respond in damages.

. . .

"In the first place, when Mr. Smith first was admitted to the hospital, [Smith] signed the following statement which was admitted in evidence: 'This is to certify that I (we) the undersigned consent to any treatment or to the administration of whatever anesthetic and the performing of whatever operation or medical procedure deemed necessary or advisable in the diagnosis and treatment of this patient.' This would seem to furnish a complete answer to [Smith's] claim of lack of authority.

"However, [Smith] infers that the conversation between him and [Dr. Gailey] prior to the questioned procedure constituted a withdrawal or limitation of the prior blanket authorization, and that [Dr. Gailey] then agreed to limitations which he thereafter exceeded: [Smith] described this conversation as follows: 'I said, "What is it with these manipulations? What are

they like?" He said, "Very painless; a little sodium pentothal and we pull the patient's limbs and try to snap his prosthesis back into place." . . . I said, "Is this all you are going to do, a manipulation?" And he said, "Yes." My brother and I looked at each other and said, "We will go along with that." '

"We fail to see that the insertion of the Steinman pin was a procedure exceeding any limitations [Smith] may have imposed. [Smith] admitted that he was not competent to say that the apparatus was not 'used in the relocation of a dislocated hip fracture in order to manipulate and pull the leg into place and then, assisted by the cast, hold it in place.' Under Dicenzo, supra, the burden was on [Smith] to clearly establish this as a prerequisite to recovery, Dr. Cushner's [a consultant] recommendation after consultation was relocation of the prosthesis 'and application of hip spica cast and Steinman pin to prevent external rotation.' The implication therefore is contrary to [Smith], that the insertion of the Steinman pin was a part of, and a completion of, the process of relocating the parts and holding them permanently in position. Such procedure would be analogous to placing a clamp on a wound or inserting a drain in an incision following a surgical operation, special authorization for which clearly is not required. If the medical practice in such cases is to the contrary, [Smith] failed to prove it.

"There being no evidence that Dr. Gailey was negligent, nor that he used any procedure which was prohibited or unauthorized, there was no issue for the jury to pass upon, and the nonsuit was properly entered as to [Smith's] claim against him."

Our study of the record clearly indicates that the court below very properly entered a compulsory nonsuit in the action against Dr. Gailey.

Order refusing to remove compulsory nonsuit in the action against Dr. Yohe (No. 16 May Term 1963) reversed. Costs to abide the event.

Order refusing to remove compulsory nonsuit in the action against Dr. Gailey (No. 17 May Term 1963) affirmed.  Costs on Smith.

———

DISSENTING AND CONCURRING OPINION BY MR. CHIEF JUSTICE BELL:

I agree with the principles enunciated by the majority Opinion in the case of Dr. Yohe but disagree with their application to Yohe's case and the ruling that no expert testimony was necessary.  I particularly disagree with that part of the Opinion which states that "the average member of a jury has a general knowledge of the efficiency of X-rays as an aid to diagnosis together with the ability to evaluate whether the failure of the physician to take X-rays, under the presented facts, evidenced a lack of judgment and care in arriving at a diagnosis on the part of the physician." For these reasons I would affirm the judgment of nonsuit in Allen Smith, Administrator v. Yohe.

I would affirm the judgment of nonsuit in the case of Allen Smith, Administrator v. Gailey.