**Small v. Temple University Hospital**

*Norman Perlberger,* for plaintiff.

*Meyer A. Bushman* and *Ira W. Bushman,* for defendants Temple University Hospital, Chatila, Patellis, Soliman, Getz, Ende, Ali and Agrama.

*Richard R. Galli,* for defendant Finestone.

MASSIAH-JACKSON, *J.,* November 10, 2008—On September 25, 2003, Mr. Rufus Small unexpectedly died while he was a patient at Temple University Hospital. Mr. Small suffocated when he was unable to breathe due to an obstruction of his endotracheal tube. The blockage was a mucous plug, that is, hardened mucous secretions at the tip of his breathing tube. These facts were not hidden or denied by the Hospital.

The litigation commenced in September 2005, when the complaint was filed by the family. Six months later in March 2006, the defense expert confirmed to Temple Hospital that Mr. Small's respiratory deterioration was related to "concretized" sections at the tip of the endotracheal tube.

Following a jury trial, a verdict was rendered on December 6, 2007. The trial testimony presented by the plaintiffs and by the defendants revealed that the failure of the nurses or the respiratory therapists or other employees of Temple University Hospital to perform regular, routine or repeated suctioning of Mr. Small's breathing tube over a period of several hours resulted in the mucous build-up which hardened and obstructed his airway, causing hypoxia/lack of oxygen and his death. Further, the failure of the Temple University Hospital employees and agents to communicate to the physicians about the patient's known breathing difficulties prevented timely medical monitoring, assessment and evaluation of Mr. Small's deteriorating situation. The jury awarded plaintiffs $1.7 million.

On September 10, 2008, the post-trial motions of Temple University Hospital were denied. See court exhibit "A", attached hereto.

In accordance with Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure, this court respectfully submits to the honorable Superior Court, the memorandum in support of order denying Temple University Hospital's motion for post-trial relief and granting plaintiff's motion for delay damages, dated September 10, 2008, as the reasons for the ruling. See court exhibit "B", attached hereto.

## EXHIBIT "A"

## ORDER

And now, September 10, 2008, after consideration of the motion for post-trial relief filed by the defendant and the plaintiff's response thereto, and, for the reasons set forth in the memorandum filed this date, it is hereby ordered that the motion for post-trial relief filed by Temple University Hospital is denied, and the plaintiff's motion for delay damages (unopposed) is granted.

Judgment is entered in the amount of $1,885,288.35 in favor of plaintiff Emmanuel Small, administrator of the estate of Rufus Small, deceased and against defendant Temple University Hospital.

---

## EXHIBIT "B"

## MEMORANDUM IN SUPPORT OF ORDER DENYING TEMPLE UNIVERSITY HOSPITAL'S MOTION FOR POST-TRIAL RELIEF AND GRANTING PLAINTIFF'S MOTION FOR DELAY DAMAGES

MASSIAH-JACKSON, *J.*, September 10, 2008—

## I. PROCEDURAL HISTORY

Following the death of Rufus Small on September 25, 2003, his family brought this medical malpractice action against several physicians and Temple University Hospital.

On December 6, 2007, the eighth day of trial, the jury returned a unanimous verdict in favor of the estate of Rufus Small in the amount of $1.7 million and against Temple University Hospital only. The jury found in favor of the three named defendant-doctors: Wissam Chatila M.D., Susan D. Agrama M.D., and Nicholas Patellis M.D. All other physicians listed on the caption were dismissed prior to trial.

The hospital has filed post-trial motions. The estate of Rufus Small filed a motion for delay damages. After receipt of the trial transcript, the parties submitted memoranda of law in support of their positions. The parties agreed to waive oral argument.

The defendant-Hospital contends that the trial court should have granted a directed verdict in favor of the Hospital, and does not seek a new trial. After careful consideration and for the reasons set forth in this memorandum, the court has determined that the plaintiff-estate of Rufus Small did meet its burden of proof. Judgment n.o.v. is not appropriate in this litigation. Temple University Hospital's motion for post-trial relief is denied.

In *Niles v. Fall Creek Hunting Club Inc.,* 376 Pa. Super. 260, 545 A.2d 926 (1988), the Superior Court commented at 264-65, 545 A.2d at 928-29:

"The entry of judgment notwithstanding a jury verdict . . . is a drastic remedy. A court cannot lightly ignore the findings of a duly-selected jury. Thus, in considering a motion for judgment n.o.v., the court must view the evidence and all reasonable inferences that arise . . . in a light most favorable to the verdict winner."

See also, *Sundlun v. Shoemaker,* 421 Pa. Super. 353, 617 A.2d 1330 (1992); *Nernberg & Laffey v. Patterson,* 411 Pa. Super. 417, 601 A.2d 1237 (1991); *Vernon v. Stash,* 367 Pa. Super. 36, 532 A.2d 441 (1987). Judgment n.o.v. is appropriate where either the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant, or the movant is entitled to judgment as a matter of law. *Somerset Community Hospital v. Allan B. Mitchell & Associates,* 454 Pa. Super. 188, 197, 685 A.2d 141, 146 (1996); *Moure v. Raeuchle,* 529 Pa. 394, 604 A.2d 1003 (1992). Neither situation is present in this action.

When considering whether a movant is entitled to judgment as a matter of law, the court must review the record and conclude that even with all factual inferences decided adverse to the movant, the law nonetheless requires a verdict in their favor. *Quinby v. Plumsteadville Family Practice Inc.,* 589 Pa. 183, 204, 907 A.2d 1061, 1074 (2006).

Under the circumstances of this case judgment n.o.v. shall not be entered. *All* of the medical testimony was consistent in the conclusion that Mr. Small's airway tube was blocked by a "concretized" mucous plug which could only have developed over a period of several hours and only if the Temple University Hospital nurses and staff failed to appropriately suction his breathing tube.

## II. FACTUAL BACKGROUND

The facts leading to the death of Rufus Small are not in dispute. Every lawyer, doctor and witness explained to the jury that Mr. Small suffered cardiac arrest as he

lost oxygen and suffocated when the secretions in his breathing tube hardened into a "concretized" mucous plug.

*Defense counsel* told the jury in his opening statement, at Day I, N.T. 70:

"My clients do not hide, nor did they hide at the time, from the fact that Mr. Small died after developing an obstruction, a mucous plug, in his breathing tube.

"This is a known, accepted risk, a complication that can occur in the best of hands and despite the best treatment."

*Plaintiff's counsel* told the jury in his closing statement, at Day VII, N.T. 55-65:

"But from 8 o'clock at night, to at least 4 in the morning . . . . Each minute he saw his life slipping away. Each minute he was gasping for air. Each minute he was in restraints and couldn't do anything about it. Each minute he had a tube down his throat and he couldn't speak. . . . Nobody bothered checking in on him.

"He's gasping for air. He knows he is dying."

*Defendant-Dr. Susan D. Agrama (expert witness)* told the jury, on Day I, N.T. 200:

"Q. When a person has a tube in them like this, are you supposed to do anything to prevent a mucous plug?

"Dr. Agrama: Routine suctioning of the tube is done.

"Q. How often?

"Dr. Agrama: Every few hours or so."

*Dr. Kevin H. Ende's (ear, nose and throat specialist)* testimony to the jury, on Day III, N.T. 52, 54:

"Q. Do you remember what Dr. Grimes [ear, nose and throat doctor] told you, other than the fact that [Mr. Small] had passed away?

"Dr. Ende: He had told me that he—basically he got called because the patient was in respiratory distress. He went down there with the bronchoscope and was unable to pass the bronchoscope, and the patient started to code and eventually died . . . .

"Q. Was it your understanding that the endotracheal tube had been clogged . . . ?

"Dr. Ende: My understanding was that Dr. Grimes felt that the endotracheal tube was clogged?"

*Dr. William Fineman, plaintiff's expert witness,* told the jury, at Day III, N.T. 122-24:

"Q. What should the staff be doing in the critical care unit when they have secretions like this?

"Dr. Fineman: The first line of approach for immobilizing secretions is to suction the patient . . . . You have an individual here who, because of this tube that's been placed down his throat cannot cough . . . .

"So, you have to have someone take a sterile suction catheter, someone knowledgeable, because there is a skill involved, and insert the tube into the airway, and try to direct it into both sides of the lungs . . . .

"What I believed happened here is that the mucous remained down in the bronchial tubes and, of course, would settle in the lowest part of the lungs, and it would

eventually dry out over time and become even harder to suction out, and even more permanent, more difficult an obstruction to remove.

"... if it's watery, that's one thing, but if the secretions become more and more like jello, they get harder to suction out and eventually they actually plug the bronchial tubes."

*Dr. Michael Anthony Grippi, the defendant's expert witness* told the jury, Day IV, N.T. 205, 208:

"Q. Well, Dr. Fineman testified, you don't get a concretized plug just like that. First, it has a watery consistency; then, as it gets harder, it's like a jelly consistency.

"To get a concretized plug—the word 'concretized' is the word concrete—that take hours, he said.

"Do you agree with that?

"Dr. Grippi: It's like that's true, yes . . . .

"Q. If that's true and there's secretions being noted and nobody is suctioning, that's pretty serious, isn't it?

"Dr. Grippi: If there were secretions, then he needed to be suctioned, I would agree.

"Q. And if he is not suctioned, that's what's going to cause this plug?

"Dr. Grippi: It is going to contribute to the development of the plug."

*Defendant-Dr. Nicholas Patellis* told the jury, Day VI, N.T. 54, 83, 120:

"Q. Were [ENT and anesthesia] able to pass through the tube?

"Dr. Patellis: With the fiberoptic laryngoscope, or the scope that goes through the tube, they were not able to advance that tube . . . .

"Q. Isn't a patient in intubation supposed to be suctioned regularly?

"Dr. Patellis: If he needs it, yes.

"Q. Who makes that determination?

"Dr. Patellis: The nurses as well as the physicians, if necessary . . . .

"Q. Why couldn't he be ventilated? . . .

"Dr. Patellis: Because the mucous plug acted like a one-way valve."

*Defendant-Dr. Wissam Chatila (expert witness)* told the jury, at Day VI, N.T. 226, 228, 234:

"Q. Okay. Now, one of the ways to anticipate those problems is to instruct them to make sure that the nurses or the respiratory therapists are suctioning on a regular basis, right?

"Dr. Chatila: Yes.

"Q. Okay. Because if they do that on a regular basis, they will either find out that there is a problem, because nothing is coming up, or, isn't coming up the way it should be, or, they are eliminating a problem, right?

"Dr. Chatila: Yeah. I mean if there are suctionings, they would be suctioning those secretions, if there are problems . . . .

"Q. Would you want Mr. Small to be suctioned regularly?

"Dr. Chatila: Regularly, routinely. . . .

"Dr. Chatila: No one expected [Mr. Small] to die at that moment, of course.

"Q. What caused him to die was this mucous plug, right?

"Dr. Chatila: Yes."

Thus, looking at the facts in the light most favorable to the verdict winner, and, in accord with trial testimony presented by the plaintiffs and by the defendants, the failure of the nurses or the respiratory therapists or other employees of Temple University Hospital to perform regular, routine and repeated suctioning of Mr. Small's breathing tube over a period of several hours resulted in the mucous build-up which hardened and obstructed his airway, causing hypoxia/lack of oxygen and his death.

## III. LEGAL DISCUSSION

### A. *Nurse Tishany Parker and Other ICU Nurses Were Employees and Agents of Temple University Hospital*

Temple University Hospital contends that because the nurses and other Intensive Care Unit staff were not specifically identified by name, then the Hospital cannot be held vicariously liable. Temple post-trial brief, N.T. 38-41. This court does not agree.

Generally, in order to maintain a cause of action for medical malpractice, the plaintiff must present expert testimony which demonstrates a variance from accepted medical practice, and establishes that this deviation from

community standards caused the plaintiff's injuries. *e.g., Hoffman v. Mogil,* 445 Pa. Super. 252, 665 A.2d 478 (1995). In this case the plaintiff presented expert testimony of the nursing deviations, *i.e.,* the failure to suction the breathing tube and the failure to communicate known breathing difficulties to the physicians. The plaintiff expert described the manner in which the deviations caused Rufus Small's death.

At the close of the evidence on Day VII, the parties submitted their jury instructions for the court to read to the jury. Temple Hospital submitted 4.02 of the Standard Civil Jury Instructions and admitted that Temple University was vicariously liable for negligent conduct of its nurse-employees. This legal admission was part of the charge read to the jury. Day VII, N.T. 122-23.

Contrary to the assertions made in the defendant's post-trial memorandum, the fact that the family members and trial witnesses knew the name of only one nurse, Tishany Parker, assigned to provide care to Rufus Small, does not relieve Temple Hospital from liability due to negligence of other unnamed staff employees. See paragraph 33 of the amended complaint:

"(33) For the purposes of this complaint, in addition to the named resident physicians, the agents, ostensible agents, servants and employees of the defendants as to whom negligence is being alleged is limited to the following discrete classes of individuals whose names are illegible in the medical records or who cannot otherwise be ascertained in advance of discovery:

"All physicians, residents interns, medical students, physicians' assistants, nurses, aides, orderlies, techni-

cians, office staff and/or attendants who provided medical care to plaintiff's decedent RUFUS SMALL at TEMPLE UNIVERSITY HOSPITAL on September 23, 2003 through September 25, 2003."

See also, Rule 1033 of the Pennsylvania Rules of Civil Procedure; *Small v. Columbia Gas of Pennsylvania Inc.,* 363 Pa. Super. 61, 69, 525 A.2d 424, 428 (1987).

Temple Hospital controlled the medical records and personnel files for the staff. The trial evidence provided sufficient details for this defendant to respond to the allegations of tortious conduct which resulted in Mr. Small's death.

Plaintiff's expert witness, Dr. Fineman, testified that Temple Hospital deviated from the standard of care in the treatment of Mr. Small and that the deviation of care contributed or led to Mr. Small's death. Day III, N.T. 98, 153-56. He explained his opinions of what went wrong, the miscommunications and the mismanagement. Dr. Fineman told the jury that the failure of the hospital personnel to suction the mucous from Mr. Small's tube was the reason Dr. Agrama was able to visualize the blockage, a "concretized" mucous plug, when the patient coded. Day III, N.T. 153-60. All of his opinions were expressed to a reasonable degree of medical certainty.

Dr. Fineman opined that when Dr. Ende, an ear, nose and throat specialist, found increased secretions in the breathing tube on the morning of September 24, 2003, the nurses and staff should have been suctioning out both sides of the lungs. Day III, N.T. 121-23. Later that evening when Mr. Small's daughters were visiting, the patient wrote two notes stating that it was "hard to breathe."

Day II, p.m., N.T. 64-69, 85-86; Day IV, N.T. 15-18, 24-26. The patient's daughters spoke with nurse Tishany Parker and other ICU staff and told them about the notes and their father's breathing problem. The record reveals that each defendant-doctor testified that the responsibility for suctioning is the nurse's responsibility, *e.g.*, Agrama, Day I, N.T. 200; Patellis, Day VI, N.T. 83; Chatila, Day VI, N.T. 226. Plaintiff's expert witness and Temple Hospital's expert witness opined that it was the nurses' duty to suction the breathing tube. *e.g.*, Fineman, Day III, N.T. 122-24; Grippi, Day IV, N.T. 123.

The undisputed evidence heard by the jury was that Mr. Small was having difficulty breathing as early as 8 p.m. on September 24. Nurse Tishany Parker knew he was having breathing difficulties. Meanwhile, the secretions were building up in his endotracheal tube and the mucous hardened. The tube was suctioned one time by a nurse at 10 p.m., thereafter Mr. Small fell asleep. The patient continued to have difficulty breathing and by 2 a.m. on September 25, he was in significant discomfort using his accessory muscles to gasp for oxygen. Dr. Agrama arrived at his bedside for the first time at about 2:30 a.m. He could not be ventilated and "concretized" secretions were observed on the tip of the endotracheal tube. Mr. Small died on September 25, 2003, as a result of cardiac arrest brought on due to the exertion of trying to breathe through the obstructed tube.

Dr. Agrama, qualified as an expert witness by her attorney, opined that the failure of Nurse Tishany Parker or other ICU nurses to communicate to her (Dr. Agrama) that they had been told by the family that Mr. Small had

difficulty breathing breached the nursing standard of care. Day II, N.T. 121.

Dr. Fineman provided the causal nexus of this failure to communicate and Mr. Small's death. None of the defendant-doctors were made aware that Mr. Small had written the notes. As a result, the physicians medicated and sedated Mr. Small under the belief that he was suffering from an ICU syndrome or psychosis. Day III, N.T. 129-31, 152-53, 166-67, 176-77.

The plaintiff's expert opined at Day II, N.T. 152-53:

"Well, the conclusion [that Mr. Small was not in respiratory failure] is in error, because we're not talking about a normal person who suddenly develops respiratory failure; we're talking about a gentleman who weighed about 120 pounds, he was a small man, who was given large doses of sedation.

"So, he was given so much sedation, and more than one kind of sedative in a relatively short period of time, so that that covered up for his respiratory decompensation and it, of course, put him to sleep.

"If you give anybody enough sedative, no matter how much distress the patient is in, you can eventually put the patient to sleep. And that's what happened in this case."

Dr. Agrama stated she believed Mr. Small was agitated because he was intubated. Day II, N.T. 117. Ativan was repeatedly administered to calm the patient. Haldol was given to him. Restraints were placed because he tried to pull out his tube. Dr. Agrama believed that Mr. Small was confused and disoriented in the ICU setting. Day II,

N.T. 27, 118-19. Significantly, she did not visit Mr. Small's bedside on the evening of September 24. She saw him at about 2:30 a.m. on September 25, 2003, when he was already in respiratory distress and coding. Compare, *Campbell v. Attanasio,* 862 A.2d 1282, 1283-84 (Pa. Super. 2004).

Because the patient was not appropriately monitored, the doctors failed to appreciate the gravity of Mr. Small's condition. Dr. Fineman summarized his opinion and conclusions at Day III, N.T. 154-55:

"He had very significant heart disease on autopsy, but it was silent while he was living.

"So, the combination of being unable to breathe and that not being managed properly by having him evaluated in a timely manner, being suctioned properly, having a portable chest x-ray done, which the x-ray was not followed like it should have been, to see why his chest was sounding worse and worse.

"Not having, as I said, the cardiogram, as a result, there was a false sense of security on the part of his caregivers, because they were trusting too much in this oximeter reading, which I tried to explain to you why you can't rely on that by itself.

"And he did not have a sampling of his arterial blood, which would have given a truer view of how his oxygen status was.

"As a result, there were several days of stress to the heart, while he tried to move air, which was increasingly difficult, and to the point where, in the end, they couldn't even get the air—force the air into him that well

when they were trying to resuscitate him, climaxed by him finally having cardiac arrest, cardiovascular blocks from his underlying heart condition, with this condition superimposed on it, shock and death."

Plaintiff's expert witness opined that with proper communication and patient care management, the defendant-physicians should have been at Mr. Small's bedside to assess and evaluate his condition. Day III, N.T. 132-34, 147-52, 182-92. Dr. Fineman's opinion was that proper nursing practice would have alerted the physicians to Mr. Small's breathing difficulties, his deteriorating situation and would have prevented the mucous build-up in the endotracheal tube.

On the other hand, Temple Hospital argued to the jury that the ICU nurses were attentive, that they appropriately evaluated and cared for Mr. Small and, they appropriately communicated information to the physicians.

Both sides agreed that by the time Dr. Agrama and Dr. Patellis arrived at Rufus Small's bedside in the morning hours of September 25, 2003, and then called on ENT and anesthesiologists to attempt to ventilate the patient, it was too late.

### 1. Mr. Small's Suffocation and Death Was the Direct, Natural and Probable Result of His Obstructed Breathing Tube

Under the particular circumstances of this case, it may be that the failure of Temple Hospital nurses to provide an unobstructed breathing tube for the patient is a matter so simple, and the want of care so obvious, as to be

within the range of the ordinary experience and comprehension of nonprofessional persons. See generally, Rule 702 of Evidence; *Smith v. Yohe,* 412 Pa. 94, 194 A.2d 167 (1963). Bernstein, 2008 Pa. Rules of Evidence, comment 4b to Pa.R.E. 702 (Gann).

Generally, courts strictly require expert testimony in a medical malpractice case, however, where the harm is the natural and probable result and so closely connected and so readily apparent that a layman can comprehend the causal connection, expert testimony may not be an absolute requirement. See Packel and Poulin, Pennsylvania Evidence, §721 and numerous cases cited at n. 3-8.

### B. *Dr. William Fineman Was Qualified To Present Expert Testimony Pursuant to the M-CARE Act.*

Section 512 of the M-CARE Act provides in pertinent part at 40 Pa.C.S. §1303.512:

*"Section 1303.512. Expert qualifications*

*"(a) General rule.*—No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.

*"(b) Medical testimony.*—An expert testifying on a medical matter, including the standard of care, risks and alternatives, causation and the nature and extent of the injury, must meet the following qualifications:

"(1) Possess an unrestricted physician's license to practice medicine in any state or the District of Columbia.

"(2) Be engaged in or retired within the previous five years from active clinical practice or teaching.

"Provided, however, the court may waive the requirements of this subsection for an expert on a matter other than the standard of care if the court determines that the expert is otherwise competent to testify about medical or scientific issues by virtue of education, training or experience."

Dr. William Fineman acknowledged that he has not had an active clinical practice since 1999. Accordingly. in order to testify pursuant to section 512(b)(2), the plaintiff's expert witness in pulmonary medicine, internal medicine and critical care must, "be engaged in . . . teaching."

After a hearing, it was the trial court's conclusion that Dr. Fineman met this qualification. His teaching activities satisfied the requirement to enable him to testify as to *standard of care as well as causation.*

In *Amato v. Centre Medical and Surgical Associates,* WL 1987427*3 (Pa. C.P. Centre 2004), the trial judge rejected plaintiff's expert witness concluding that his informal role as a mentor provided, "no indicia of evidence that the doctor operated in the role of a teacher." The proffered expert had left his clinical practice 15 years earlier, had no schedule, no compensation, no formal classroom, and no lectures or research. In *Weiner v. Fisher,* 871 A.2d 1283 (Pa. Super. 2005), the record was

remanded to the trial court because the proffered expert provided, "vague pronouncements of teaching activity." 871 A.2d at 1290. There was insufficient evidence of who the "students" were, what the subject matter consisted of the academic settings and level of teaching, the amount of time spent each week for the teaching.

This court is mindful of the legislative intent to regulate and enhance the qualifications of medical experts who testify about the standards of care in medical malpractice litigation. Dr. Fineman's testimony during the hearing on the motion in limine established that he possessed "sufficient education, training, knowledge and experience to provide credible, competent testimony . . . ." 40 P.S. §1303.512(a); *Weiner v. Fisher, supra.*

Dr. Fineman's in limine hearing testimony (Day III) revealed that he had an active clinical practice from the time he graduated from the University of Pennsylvania Medical School and completed his residency in pulmonary and internal medical [sic] from 1978 to 1999. Day III, N.T. 10. From 1999 to 2002, Dr. Fineman was the medical director of CIGNA, then became the medical director of Horizon Blue Cross and Blue Shield since 2002. He goes to hospitals, consults and confers with attending physicians and hospital department heads. N.T. 10. He personally goes to nine hospitals in the Delaware Valley region to teach nurses, attending physicians, department heads, and quality review people and physicians who are employed by hospitals with regard to the standard of care in pulmonary medicine for the member-patients. N.T. 18. He is responsible to visit the hospitals to consult with and teach attending physicians, review

cases and patient care. N.T. 17. Because he is the only lung specialist for Horizon Blue Cross in New Jersey, he is expected to teach nurses and physicians in his area of expertise, pulmonary care and critical care. N.T. 17. He is part of a team which oversees care of member-patients; he reads hemodynamic lab information in the critical care setting; and coordinates the care and treatment. N.T. 12-13.

Dr. Fineman works day-to-day on clinical management issues on member-patients who are hospitalized in the general hospital setting and critical care setting. He will discuss new therapies, choice of therapies and implementation decisions by physicians, technology or instrumentation decisions for member-patients. N.T. 19. He meets with the clinical treatment team to review patients at certain hospitals. N.T. 20. His teaching responsibilities involve daily patient care with physicians, nurses and staff. N.T. 21.

Dr. Fineman testified that he is actively involved with the quality and adequacy of the treatment, appropriateness of treatment, the application of technology, and the management of the care of individual member-patients on a daily basis. N.T. 22. Further, he actively reviews the plans of care and the medication for patients who are intubated, coding and who suffer from cardiac problems. N.T. 23. Although. Dr. Fineman does not have a clinical practice, he instructs residents, doctors and fellows and caregivers of the patients about how to proceed diagnostically or with patient management. N.T. 26-29.

At the close of the in limine hearing, the record established by the plaintiff was not vague or ambiguous. Dr.

Fineman's day-to-day role is not informal or unstructured. Rather, the plaintiff established that the witness was qualified in the areas of pulmonary medicine, internal medicine and critical care. He is currently engaged in daily and active instruction of physicians, nurses and staff in actual medical practice. Dr. Fineman's daily activities were not limited to administrative or consulting or advisory. The background and experiences presented by Dr. William Fineman met the enhanced standards set forth in section 512 of the M-CARE Act.

The plaintiff presented Dr. Fineman to the jury. The witness reviewed his background and experiences for the jury during voir dire. Temple University Hospital's post-trial memorandum disparagingly asserts that Dr. Fineman is "an insurance company employee with obvious interests, not an academic seeking to impart generalized wisdom for its own purpose." Page 31, Temple's memorandum, dated April 29, 2008. This witness affirmatively rejected defense counsel's similar commentary during the trial. Day III, N.T. 90:

"Dr. Fineman: . . . My decisions are independent of whether people get—there is payment made or not.

"I oversee the quality of care, the medical necessity for care. Payment decisions are made by an entirely different group. I don't know what their ultimate decisions are. I don't care to know what their ultimate decisions are.

"I feel that in my capacity I serve to be an advocate for the patient, to see that they're getting the right kind of care when they need it, and to protect them from, unfortunately, overutilization of by physicians or im-

proper care by physicians, or protect them from, unfortunately, the incompetence of physicians.

"So, I feel that I'm kind of like the internal affairs department of the police force. I'm looking out to try to protect the public from internal forces that may be negative in their care."

While Temple Hospital suggests that the Pennsylvania Legislature limited the meaning of "teaching" to lecture halls and course preparation, even Dr. Grippi, the defense expert, understood that being engaged in medical teaching includes teaching at bedside rounds as well as instructing individual doctors, residents, fellows or interns while evaluating a patient. Day IV, N.T. 82-84. Dr. Fineman described his role in detail as one of the team of diagnostic and care management physicians actively teaching other physicians, nurses and health care clinicians responsible for patient care on a daily basis.

The trial court determined that Dr. Fineman was appropriately qualified as plaintiff's expert medical witness in this case.

## C. *Temple Hospital's Attempt To Impeach Dr. Fineman by the Use of Extrinsic Evidence Was Improper*

Near the end of the trial and *four days after plaintiff's expert witness testified,* counsel for Temple Hospital announced for the first time that they located a physician from Thomas Jefferson University Hospital who was being offered to challenge the qualifications and the credibility of Dr. William Fineman. Day V, N.T. 11, 60-70. At defense request, the jury was sent home and a second in limine hearing was held to consider again

whether plaintiff's expert witness was qualified under the M-CARE Act. After the hearing, the trial court denied Temple Hospital's request to either strike Dr. Fineman's testimony or to permit the Jefferson doctor (Gregory Kane M.D.) to testify to the jury. Day V, N.T. 61-71; Day VI, N.T. 278-98, 303-18.

Initially, it must be noted that the untimely objections to Dr. Fineman's qualifications presented at the first and second in limine hearings could have been raised prior to trial. See *Vicari v. Spiegal,* 936 A.2d 503 (Pa. Super. 2007) at 512 n.10, where the honorable Superior Court commented:

"Although we do not condone the defendants' untimely objection to Dr. Blum's qualifications and find plaintiff's waiver argument persuasive, because we have determined that Dr. Blum was indeed qualified to render his opinion, we decline to engage in an analysis of the parties' competing waiver arguments."

While Pennsylvania Rule of Evidence 607 permits the credibility of witnesses to be impeached by any evidence relevant to the issues, the law governing impeachment evidence draws a clear distinction between extrinsic and non-extrinsic evidence. Packel and Poulin, Pennsylvania Evidence §607-1 (West, 2nd ed. 1999). When the so-called impeaching evidence is elicited by calling another witness, the impeaching evidence is called extrinsic evidence. Packel and Poulin state:

"Impeachment by extrinsic evidence will be prohibited. This treatment is appropriate where the likelihood of prejudice, confusion of issues, or waste of time exceeds the possible probative value of the extrinsic evi-

dence. . . . the party is 'bound by the witness' testimony' in cross-examination."

In the case at bar, Temple Hospital knew the name of, and received the curriculum vitae of, plaintiff's expert witness, William Fineman M.D., more than six months prior to trial. Day V, N.T. 19-27. This litigation involved the unexpected death of a patient. All of the resources of this major medical institution were available for timely and thorough investigation.

Packel and Poulin cite McCormick, Evidence §47, 49 (4th ed. 1992), and notes:

"When impeachment evidence has been offered, a party may offer evidence to rehabilitate the witness."

When the "surprise" physician-witness from Jefferson Hospital appeared in the courtroom, it was too late for the parties to make inquires of Dr. Fineman to clarify, amplify, modify or rehabilitate his testimony. It was too late for the parties to subject Dr. Grippi, defense expert, to additional questions about his testimony. The surprise witness was presented to the court *after* plaintiff's expert witness testified for a full day, and *after* the defense expert testified for another full day, and *after* multiple telephone calls were exchanged between doctors and lawyers. *All* of this unusual activity emanated from personal friendships of the defense attorneys. See also, Bernstein, 2007 Pa. Rules of Evidence, comment 4 to Pa.R.E. 607 (Gann), noting a court has great discretion to limit or reject collateral attacks on a witness' credibility by extrinsic impeachment.

The record supports the trial court's decision. First, Dr. Fineman was extensively voir dired by all counsel.

The court concluded that he did meet the M-CARE Act requirements. Day V, N.T. 66-68. Next, there was no opportunity to rehabilitate the expert witness. It would have confused the jury and unfairly prejudiced the plaintiff if Dr. Kane testified without the opportunity for Dr. Fineman to respond. Temple Hospital is bound by its extensive cross-examination of Dr. Fineman on Day III of the trial (140 pages of transcript). This manner of extrinsic impeachment evidence (trial by ambush) was unfair and was collateral and was properly excluded. 3A. Wigmore §§877-878.

### IV. PLAINTIFF'S MOTION FOR RULE 238 DELAY DAMAGES IS GRANTED

Following the jury verdict of $1.7 million on December 6, 2007, the plaintiff-estate of Rufus Small filed a motion for delay damages which was calculated in the amount of $185,288.35. Temple Hospital did not oppose plaintiff's motion.

Accordingly, the verdict will be molded and judgment will be entered in the amount of $1,885,288.35.

### V. CONCLUSION

For all of the reasons set forth above, the motion for post-trial relief filed by Temple University Hospital is denied.